No. 13804

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

WILLIAM JOHN COLLINS,

Defendant and Appellant.

Appeal from: District Court of the Eighth Judicial District,
Honorable Truman G. Bradford, Judge presiding.

Counsel of Record:

For Appellant:

Smith, Emmons, Baillie & Walsh, Great Falls, Montana
Robert J. Emmons argued, Great Falls, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Allen B. Chronister, Assistant Attorey General, argued,
Helena, Montana
J. Fred Bourdeau, County Attorney, Great Falls, Montana
Nick Browning, Deputy County Attorney, appeared, Great
Falls, Montana

Submitted: April 20, 1978

Decided:

Filed: JUL 14 1978

Thomas J. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Defendant William John Collins was charged in the District Court, Cascade County, with the offense of deliberate homicide. Upon his plea of not guilty, after trial, the jury returned a verdict of guilty of mitigated deliberate homicide. Judgment of conviction was entered, and defendant was sentenced to imprisonment for a term of forty years. From judgment and denial of a new trial, defendant appeals.

Without question, on April 23, 1973, defendant shot Darrell David Gardipee, who died as a result. The shooting occurred on Wire Mill Road, north of Great Falls. The only witnesses to the events prior to the shooting were the defendant and Carla Brave. Two others, Robert M. Bretz and his wife, drove upon the scene very shortly after the shooting. The only witness to the actual shooting was defendant.

From the evidence it appears defendant, a 48 year old unemployed painter, at and prior to the time of the shooting was living in a camper mounted on his pickup truck. He had been in Great Falls 4 or 5 days, with no definite location, parking his pickup and camper unit in various places from time to time. Before returning to Great Falls, he had been in Arizona since the previous September doing some prospecting there.

Carla Brave, then in her twenties, a singer with a band that played in local night spots in Great Falls, met Gardipee, then 21, about six months before the incident. They became good friends. In the afternoon preceding the shooting, Gardipee went to the place where Carla was rehearsing. After the practice session, he invited Carla to accompany

him to the Brass Rail, a local bar. There they had some drinks and played pool at a table at the rear of the premises.

While Carla and Gardipee were at the Brass Rail, about 6:30 or so in the evening, defendant entered the bar. He had been drinking before he arrived, and upon entering he ordered a round of drinks for the house. He noted Gardipee and Carla playing pool and fell into conversation with them, although he did not know them. He bought a round or two of drinks. They all talked and played some pool and continued to consume liquor.

Finally they decided to go to another place. Defendant had the transportation facilities so he drove them to the City Bar, where Gardipee went in and returned with a bottle of wine.

Carla testified that all three inspected the inside of the camper while they were stopped at the City Bar; defendant remembers the location as at the Brass Rail. At any rate, the camper was inspected and admired by Carla and Gardipee. Carla particularly testified that at the time of the inspection, she saw no rifle lying on a bed in the camper, nor indeed did she observe one in the camper otherwise.

When they left the City Bar, Carla wanted to go to her place, but Gardipee wanted to ride around. Defendant drove the unit out of the city on the Havre highway, and then turned off that highway to the Wire Mill Road, thence to a place not far from the Missouri River, where he parked. All three were sitting in the cab of the pickup.

When they stopped, Carla and Gardipee got out and wandered towards the river. The night was cold, but they talked and kissed about an hour before she returned to the

cab, where defendant had remained. He had continued to drink, consuming beer they had brought from the Brass Rail, and some whiskey he had procured from the camper. Gardipee was drinking from the wine bottle.

Carla and defendant talked in the cab for a time, while Gardipee remained outside. Defendant told Carla that he thought "everybody should make love to everybody". The remark "kind of spooked" her. Then he asked her if she would like to go to the camper in back and drink whiskey with him. Carla also testified about another matter he discussed, to which we will allude more fully later in this opinion.

Carla left the cab, and defendant remained inside. She rejoined Gardipee, but did not tell him of the conversation in the cab.

Meanwhile, Gardipee was acting strangely. He was raising the wine bottle to the sky, jumping up and down, and he appeared to defendant to be "flipping out."

Finally, near midnight, they decided to leave. All three got in the cab, Carla sitting in the middle. Defendant drove up to the point of again entering Wire Mill Road. Here Gardipee grabbed the steering wheel and wanted to turn right. Defendant, however, wanted to go back to Great Falls, which was to the left. Meanwhile Gardipee was complaining how the white man had messed up the Indian land, and said "This is our land." Then he slammed his fist on the dash of the cab and said "Even this belongs to me." Defendant testified that at that point, Gardipee started punching him in the head while he was driving.

Defendant stopped the truck in the lane of traffic of the roadway. Gardipee got out on his side of the pickup.

Defendant testified he jumped out of the truck on the driver's side and ran back to the rear of the camper. He opened the rear door and got into the camper, and attempted to lock the camper door behind him.

Defendant testified that then the door of the camper was jerked open by Gardipee, who said "I've got you now" or words to that effect. Defendant was inside the camper, possibly in the middle of the camper. Gardipee was at the door with one hand on a handle to help himself in and defendant said he saw something "bright colored" in his other hand. Defendant did not know what it was, nor was it ever further identified at the trial.

The interior of the cab was dark. Defendant had not turned on the interior camper lights. The outside lights of the camper unit were on, including the clearance lights. Defendant testified that it was dark enough however that he could not have identified the person as Gardipee coming into the truck, nor could he see Gardipee's eyes.

Defendant had in the camper a bolt-action .22 caliber rifle he had purchased in Great Falls, prior to going to Arizona for prospecting. Defendant testified that after Gardipee jerked the camper door open, defendant ran a step or two to the front of the camper and picked up the rifle from the bed where it was lying. He turned without raising the gun to his shoulder, keeping it in his right hand, and fired. He stated he did not intend to shoot Gardipee at the time; that he thought it would scare him off; and, that the gun went off accidentally.

Because of the make and type of rifle involved, the gun must have been ready to fire, with a bullet in position in the chamber. Defendant said nothing and gave no warning before he fired the shot.

The bullet entered the body of Gardipee nearly in the middle front at the level of the seventh rib and traveled downward at an approximate forty-five degree angle through his diaphragm, the posterior of his liver, through his vena cava and lodged next to his spine in the abdomen. Gardipee fell back from the camper to the ground. He was in a doubled-up position on the ground when Carla came from the cab, where she had remained after the men got out, until she heard the shot which sounded like an "explosion".

Defendant was getting down from the camper when Carla came to the scene. He still had the rifle in his hand. At that moment another car drove up, driven by Robert Bretz, with his wife as a passenger. Defendant placed the rifle on the floor of the camper, went around to the cab of the pickup, got in, and drove off, leaving Gardipee on the roadway, with Carla bending over him. Defendant drove to the Cascade County sheriff's office, where he turned himself in.

Meanwhile Robert Bretz, his wife and Carla put the bleeding Gardipee into the Bretz car and went to the hospital, where he expired of his wounds at approximately 12:55 a.m. An autopsy was later performed which established the cause of death.

The foregoing outline of facts is taken mainly from defendant's testimony. There are certain discrepancies between his testimony and other witnesses in other matters, but the story of the events surrounding the actual shooting came mainly from defendant.

The jury listened to the testimony, considered the relevant facts proven, and brought in its verdict of guilty of mitigated deliberate homicide against defendant.

Defendant's appeal concerns mainly five issues which attack the verdict and subsequent judgment:

1. Whether the District Court properly admitted testimony of an alleged statement of defendant that he had been imprisoned for rape.

2. Whether the District Court properly instructed the jury.

3. Whether defendant was denied a speedy trial.

4. Whether the District Court erred in admitting certain photographs in evidence.

5. Whether the evidence supports the jury verdict.

The first issue, the alleged statement of defendant that he had been imprisoned for rape, arose during the testimony of Carla Brave about her conversation in the cab of the pickup with defendant while Gardipee was outside. In addition to the subjects outlined above, Carla was permitted to testify, over objection, that defendant told her during the conversation that defendant knew Merle Gardipee, the brother of Darrell Gardipee; that he had met him in prison. She asked defendant "what were you in there for?" and he "said he was in for rape."

The state contended the evidence was relevant to the events and to the attitude and intent of the defendant that evening. Defendant's counsel objected that the offered testimony was hearsay, and was an attempt by the state to get into the record a statement of a fact that was not a fact at all. Also, that in rebutting such testimony, defendant would perforce open himself up to questioning on state's cross-examination as to a prior prison record. (In argument before this Court, the state argued the evidence is part of the "res gestae", while defendant argued the testimony was an improper showing of another unrelated crime.)

When she was cross-examined by defendant, Carla admitted she had been told in the county attorney's office that defendant had not been convicted of rape. In defendant's cross-examination by the state, he admitted he had been convicted of a prior felony, not specified, and the matter was not further pursued.

The net effect of the evidence then was that defendant told Carla he had once been in prison for rape; she admitted that later she was informed it was not true; and defendant admitted he had a prior felony conviction on his record.

The objection on appeal that the testimony constituted proof of a prior unrelated offense does not bear analysis. The state did not prove that defendant <u>committed</u> an unrelated crime; it did prove that defendant <u>claimed</u> he committed such an offense. The difference could be monumental. It is the same difference as an unmarried woman who <u>is</u> pregnant and an unmarried woman who <u>claims</u> to be pregnant. A subsequent marriage founded upon the reality may be justified; but a marriage founded upon the supposition may not be.

The statement of defendant is in the same category of evidence, occurring at the same time as the other verbal acts testified to by Carla, such as defendant's statement about everybody making love to everybody, and his invitation to her to drink whiskey with him in the camper. These remarks went in without objection.

The statement of defendant was relevant as a part of the whole factual situation to be considered by the jury in weighing the guilt or innocence of defendant. Especially is this true where, as here, the defendant asserted self-defense as justification. His state of mind leading up to

the shooting was a matter bearing on his guilt or innocence for the jury to consider in the light of that defense. The statement was therefore a "verbal act" relevant to the issues, and thus admissible. As noted in Overton v. United States, (1968), 403 F.2d 444, 447, the verbal act doctrine is technically not an exception to the hearsay rule. The words of defendant were not offered for the purpose of proving the truth of the assertions they contained, but merely for the purpose of establishing the fact that the words had been said by the defendant. Ward v. United States, (1961), 296 F.2d 898.

On the other hand, the statement was not admissible as part of res gestae, as that exception to the hearsay rule takes in statements made under such circumstances that reflection and fabrication are unlikely. State v. Fairburn, (1959), 135 Mont. 449, 340 P.2d 157. Standing alone the statement might not be relevant or material, but it formed a part of the circumstances, a link which, when connected to other evidence, becomes relevant and material in the case. 29 Am Jur 2d, Evidence §255. As such the statement was clearly admissible and the District Court committed no error in permitting it. We find no substance in defendant's first issue.

In his second issue, the defendant contends the District Court committed error in instructing the jury. This issue involves two sub-heads, (a) whether a "ladder" instruction should have been given to the jury, and (b) whether the jury was properly instructed with respect to self-defense.

In considering this issue, we first analyze the law applicable to deliberate homicide, and the inferior grades of homicide thereunder, as well as the applicable law of justification or exoneration.

When Montana adopted its Criminal Code of 1973 (Title 94, Chapters 1-8, Revised Codes of Montana 1947), it wiped out the theretofore existing statutory provisions defining the crimes of murder and of manslaughter. In lieu, the new code provided that criminal homicide includes deliberate homicide, mitigated deliberate homicide, and negligent homicide. Section 94-5-101 et seq., R.C.M. 1947. In capsule, the grades of criminal homicide can be defined as: an unlawful death caused by a negligent actor is negligent homicide; an unlawful death purposely or knowingly caused by an actor under the influence of extreme mental or emotional stress for which there is a reasonable explanation or excuse is mitigated deliberate homicide; and, an unlawful death caused by one acting purposely or knowingly is deliberate homicide. Section 94-5-102; 94-5-103; 94-5-104, R.C.M. 1947.

It is to be noted from the definitions that committing the homicide "purposely or knowingly" is an element of deliberate homicide, and also of mitigated deliberate homicide. In the case of mitigated deliberate homicide, even though the act may have been committed purposely or knowingly, it is one that is committed under the influence of extreme mental or emotional stress for which there is a reasonable explanation or excuse.

In considering the instructions given by the court, we must also look to the law on justification or exoneration, more popularly known, perhaps, as "self-defense". Under the old code, a homicide committed in self-defense was "excusable homicide". Under the Criminal Code of 1973, conduct necessary to defend oneself or another against the imminent use of unlawful force may result in such conduct being a justifiable

use of force. Section 94-3-103, R.C.M. 1947. When a person in an occupied structure uses such force as is necessary to prevent or terminate another's unlawful entry into the occupied structure, even to the extent of causing death by the use of the force, for the purpose of preventing an assault or personal violence upon an individual or to prevent the commission of a forcible felony in the occupied structure, such use of force is justified. Section 94-3-103, R.C.M. 1947.

At all events, the degree of force used by the actor must be reasonable, based upon what a reasonable person would believe under the same circumstances. Sections 94-3-103, 94-3-104, R.C.M. 1947; State v. Brooks, (1967), 150 Mont. 399, 436 P.2d 91.

The foregoing are the concepts in a criminal homicide case, such as the one charged here, which must be conveyed to the jury by the judge in the body of his instructions. He may flesh out such concepts as may be necessary but if the body of the instructions contains the foregoing elements, fairly and fully conveyed to the jury, then we must consider the jury has been properly instructed both for the state and the defendant.

Against that background, we examine the instructions given in this case. The essential elements are there. The trial court defined the grades of criminal homicide (Instruction No. 32); it defined deliberate homicide (Instruction No. 31), mitigated deliberate homicide (Instruction No. 18), and negligent homicide, (Instruction 19). Moreover, the jury was instructed on the justifiable use of force to defend oneself against the imminent use of unlawful force, and the justifiable use of force against a person breaking

-11-

into an occupied structure, substantially in the language of the statutes. Using the test applied in State v. Porter, (1964), 143 Mont. 528, 539, 391 P.2d 704, the instructions given on justifiable force gave the defendant ample opportunity to expound to the jury in argument his theory with respect to the use of force as self-defense against an unlawful act.

On oral argument, defendant strenuously argued that nowhere in the instructions did the court advise the jury, with respect to mitigated deliberate homicide, in what circumstances the jury should acquit the defendant. Defendant points out that in Instruction No. 1, the court outlined the elements of deliberate homicide and stated that defendant should be acquitted if the elements were not proved. In Instruction No. 17, it pointed out the elements of negligent homicide and stated that if those elements were not proven beyond a reasonable doubt that defendant should be found not guilty. Contrasting those instructions with the lack of a similar instruction with respect to mitigated deliberate homicide, defendant contends grievous error on the part of the District Court. In essence defendant is complaining that if the jury found a justifiable force used by defendant the instructions did not say that in such event the jury should acquit the defendant.

Two things militate against this position of defendant. First, such an instruction was not offered by defendant; and second, the rule in Montana is that if the jury is properly instructed on the law pertaining to justifiable force in a homicide case, the court need not go further and tell the jury that it must acquit the defendant, if it finds that justifiable force was used. State v. Smith, (1975), 168

Mont. 93, 100, 541 P.2d 351; State v. London, (1957), 131
Mont. 410, 433, 310 P.2d 571.

Defendant further argues that the District Court erred
in refusing to give defendant's proposed instruction No. 6,
which would have told the jury that if it had a reasonable
doubt whether the homicide was justifiable, then it must give
the defendant the benefit of that doubt and acquit him.
That specific instruction was refused in State v. Logan,
(1970), 156 Mont. 48, 66, 473 P.2d 833, and this Court
approved.  The Court in Logan indicated that such instruc-
tion was unnecessary where the jury is otherwise properly
instructed on reasonable doubt.  In this case, Instruction
No. 2 fully covered the jury's duty with respect to rea-
sonable doubt.

Defendant further argues that his proposed instruction
No. 4 which would have instructed the jury with respect to
justifiable homicide, that is the use of justifiable force,
was improperly refused.  As stated however, this subject was
fully covered by the court in other instructions, and it
appears that in its Instruction Nos. 23 and 24, the court
particularly instructed the jury to the effect that the
person using force, if acting as a reasonable man, is justi-
fied in acting as he did. Indeed, in Instruction No. 24, it
is stated that a person may act under the appearance of
peril if that appearance makes the person acting believe
that he is in deadly peril of his life or of receiving great
bodily harm, and if a reasonable man, in the same situation
seeing and knowing what the actor knows, would be justified
in believing himself in danger.  Since counsel was not
limited under those instructions from fairly presenting his
defense to the jury, the defendant will not be heard to

-13-

complain that the court failed to give the many different nuances on a theory of defense that might have been devised.

Finally, under this issue, with respect to the contention made at oral argument that the court should have given a "ladder" instruction which would have (1) encompassed the various grades of homicide under criminal homicide, (2) instructed as to the elements, and (3) advised the jury to convict or acquit with respect to each such possible offense or inferior grade of offense, the answer remains the same: such an instruction was not offered, and in any event the instructions adequately covered the offenses of which the defendant could be convicted and his defenses thereto. It is not to be forgotten that in this case the court sent four possible verdicts to the jury, including one for each grade of criminal homicide and one for acquittal, and defendant made no objection at that time to the forms of verdicts being submitted to the jury for its use.

We conclude therefore that the trial court committed no error with respect to the second issue raised by defendant.

Defendant in his third issue argues that he was denied a speedy trial as required by the Fourteenth Amendment to the United States Constitution and by Article II, Section 24, 1972 Montana Constitution. Counsel for defendant in oral argument conceded that the prejudicial delay does not extend beyond the first eleven months.

The following timetable of events is pertinent to a determination of this issue:

| | |
|---|---|
| April 23, 1975 | Date of arrest. |
| April 28, 1975 | Information filed. |
| April 29, 1975 | Defendant arraigned. |
| April 30, 1975 | Defendant posted bond. |

| | |
|---|---|
| May 2, 1975 | Defendant filed motion to produce confession-statement on demand for discovery and production of evidence for inspection. |
| May 21, 1975 | Defendant disqualifies Judge Nelson. |
| May 23, 1975 | Judge Bradford called in. |
| August 23, 1975 | Defendant files notice of intent to rely on self-defense and motion for order to take the deposition of Carla Brave. |
| October 1975 | Defendant leaves Montana for Arizona to seek employment. |
| January 29, 1976 | Trial date set for March 29, 1976. |
| March 3, 1976 | Defendant returns to Montana from Arizona. |
| March 29, 1976 | Trial date vacated at defendant's request. |

Under defendant's concession--that only the first eleven months are to be considered under the speedy trial issue, we have a period of 336 days elapsing from the date the Information was filed until the first trial date. This number of days is greater than the presumptive period established in State ex rel. Sanford v. District Court, (1976), ____ Mont. ____, 551 P.2d 1005, 33 St.Rep. 644, as a prima facie case of delay. Accordingly, we are called on to balance the factors set out in Barker v. Wingo, (1972), 407 U.S. 514, 92 S.Ct. 2128, 33 L Ed 2d 101, to determine the speedy trial issue. These factors are--length of delay; the reason for delay; defendant's assertion of his right; and, prejudice to the defendant.

The first factor, length of delay, is established. The second and third factors we consider together. It appears that defendant sought and received permission to leave

Montana for Arizona while his trial was pending. The reasons for his leaving were personal to defendant. The period of time he was away from the state on personal business cannot be counted against the state. That period encompasses the month of October 1975 through the first trial date of March 29, 1976, which date was vacated at defendant's request. The record shows negatively for that period that defendant wanted or was ready for a trial, much less that he was asserting his right to trial.

Of significance also is the fact that defendant did not file his intent to rely on self-defense until August 23, 1975. In explaining his delay in so filing, defendant stated he needed the intervening time to complete his investigation, and only on completion did he determine to rely on self-defense. Again, defendant is not in a position to charge the state with the time he himself required to complete the investigation necessary for his defense. It is obvious that in the period from his arraignment until August 23, 1975, he was not ready for nor did he want a trial of the charge against him.

That leaves the only unexplained time, a period from August 23, 1975 until an unspecified date in October 1975, to be accounted for. That period of time, even if it were to be counted fully against the state, would hardly qualify as a prejudicial deterrent to defendant's fair and speedy trial, especially when in that period defendant was planning to leave the state, and no prejudice is shown to the defendant's rights.

The fourth factor to be considered, the prejudice to the defendant, has no support in the record. Nothing has been brought to our attention that would show the delay

-16-

hampered defendant in any way in presenting his defense. Defendant claims the delay caused him concern and anxiety, but these are inherent in any criminal case. Barker v. Wingo, supra. Here, the state accommodated defendant to ease his anxiety. It vacated a trial date because of his up-coming surgery. It allowed him to leave the state to seek a job. If anxiety and concern were present, they were as much the result of the needs of the defendant, as of any delay in the speedy trial process.

We find therefore that defendant fails to meet the criteria necessary to show he had been denied a speedy trial by the state. State ex rel. Sanford v. District Court, supra; Barker v. Wingo, supra; State v. Steward, (1975), 168 Mont. 385, 388, 543 P.2d 178, 181.

Defendant's fourth issue deals with the question of whether the trial court erred in admitting certain photographs into evidence. Defendant argues the photographs were so highly prejudicial as to cause reversible error. Defendant relies on State v. Bischert, (1957), 131 Mont. 152, 308 P.2d 969, for this contention.

In the instant case, Dr. John Henneford, a pathologist, testified as a prosecution witness to establish the cause of death. Two black and white photographs of the deceased taken during Dr. Henneford's autopsy were offered and admitted over defendant's objections. The doctor testified that while it would be possible to explain the autopsy and diagnosis without the pictures, his testimony would be clear, precise, and easier to understand if the photographs were used. The doctor then used the photographs to describe the angle of the entry wound and its path through the body. The demonstration of the angle of the entry wound was

important in determining the credibility of defendant's testimony that the victim was attempting entry into the camper when the fatal shot was fired.

Bischert is distinguishable from the instant case. In Bischert the colored photographs depicted the emaciated body of a child with a ghastly skin disease not related to malnutrition, from which the child died. In the instant case there is no showing that the black and white autopsy photographs showed any inflammatory or prejudicial conditions unrelated to the crime charged.

In State v. Rollins, (1967), 149 Mont. 481, 428 P.2d 462, the Court upheld the admissibility of photographs of a victim's gunshot wounds, distinguishing Bischert upon the grounds the photographs in that case were "particularly distasteful" and did not contribute to the development of the case. In the instant case these photos helped the jury to understand the facts of the case and therefore they were properly admitted into evidence.

The final issue raised by defendant is whether the evidence supported the jury verdict. One of defendant's claims is that the prosecutor's major witnesses' testimony was inconsistent and unreliable. There is no question that some of the evidence in this case was contradictory; nonetheless the jury viewed the witnesses as they testified and weighed their testimony.

The standard of this Court in measuring a jury determination is stated in State v. Merseal, (1975), 167 Mont. 412, 415, 538 P.2d 1366:

> "This Court remains ever mindful of one fundamental rule--that questions of fact must be determined solely by the jury, and that given a certain legal minimum of evidence,

this Court on review will not substitute its judgment for that of the jury. * * *

" * * *

"On appeal we examine the evidence to determine whether the verdict is supported by substantial evidence. In so doing, we view the evidence in the light most favorable to the State. * * *"

See also: State v. Farnes, (1976), ____ Mont. ____, 558 P.2d 472, 33 St.Rep. 1270; State v. Stoddard, (1966), 147 Mont. 402, 412 P.2d 827. Therefore, this Court is limited to an examination of the evidence in the light most favorable to the state and a determination of whether there was substantial evidence to support defendant's conviction. The evidence supports the verdict.

One other contention under this final issue is that the verdict of the jury is inconsistent with the evidence in that since the defendant was convicted of mitigated deliberate homicide, the jury must have found defendant was acting under extreme mental or emotional stress brought about by the apparent intended attack upon his person and his property. Defendant contends the only possible mental or emotional stress for which there was a reasonable explanation or excuse suggested by the evidence is that defendant feared for himself in the circumstances described. Therefore, defendant argues, if the jury found such stress to exist, it could only be such stress as would permit self-defense. Then defendant returns to his former argument that since the court did not instruct the jury that it should acquit the defendant when self-defense was established, the verdict is inconsistent with the evidence.

What this contention of defendant overlooks is that while under the facts of this case the jury could have found defendant was acting under mental or emotional stress

brought about by the attack by Gardipee, the jury could also have found the counter-force used by the defendant was so excessive as not to be reasonable and justified. Section 94-3-102, R.C.M. 1947. The jury could have concluded that the force used in self-defense by defendant, the shooting, was not the action of a reasonable person under the circumstances. In that situation, a verdict of mitigated deliberate homicide is justified. It is not given to us, however, to look into the minds of the jurors to ascertain how they arrived at their verdict. When, as here, we find the jury was fairly instructed, we must leave the weighing of the evidence and determination of the facts to that jury. It is not within our province to set aside the verdict here.

The judgment of conviction is affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____
Justice

_____
Hon. Edward T. Dussault, District
Judge, sitting in place of Mr.
Justice Daly

Mr. Justice Daniel J. Shea dissenting:

Defendant should be granted a new trial. Testimony of Carla Brave relating to defendant being in prison for rape was not only prejudicial, it was not relevant. Moreover, the court failed to instruct the jury on the essential elements of the offense for which defendant was convicted.

Before witness Carla Brave testified to the statement made by defendant that he had been in prison for rape, defense counsel moved that the statement be suppressed. The prosecution then made an offer of proof as to the relevancy of the statement to the following effect:

> "Your Honor, we offer to prove by the testimony of Carla Brave, in light of the question asked her, that William Collins volunteered that he had been in prison, and that he had been in prison for the crime of rape. And we, in that regard, suggest this is relevant, inasmuch as it isn't true, that that fact is not true. It shows what was on Mr. Collins' mind at that time, namely sex with Carla Brave. And that certainly bears on the events as they later transpired. Who did what for what purpose. In that regard it is strictly relevant, it is material. And because it is an admission, a statement made by the defendant, and because it is relevant and material, we suggest that the Court hear the testimony." (Emphasis added)

The court then let the jury hear the testimony. During cross-examination Carla Brave admitted that in talking to a deputy after the shooting that he had told her that defendant had not been in prison for rape.

Defendant asserted self-defense and while testifying in his own behalf stated that he had not made the statement to Carla Brave. However, he was also impeached under the old rule in Montana which was mechanically followed by trial judges which allowed the state to ask the defendant if he had ever been convicted

-21-

of a felony. Defendant admitted that he had, but the nature of the felony was never stated to the jury. The situation was such that at the end of the prosecution's case the jury did not know whether defendant had been in prison for rape. The situation was not alleviated by the defendant's testimony. He denied that he had been in prison for rape, but also admitted that he had been convicted of a felony, although the jury did not know the nature of that felony. It would certainly be understandable that a jury would conclude that defendant did not tell the truth when he denied making the statement to Carla Brave. For this reason alone, the jury may have decided to distrust defendant in the remainder of his testimony.

The majority has concluded that the statement, although known by the prosecution to be false, was relevant to the defendant's state of mind preceding the shooting. Relevant to what? On this point the opinion is silent. If true, what did the statement tend to prove? Even if made, this statement was clearly not relevant to any issue in the case. Moreover, its prejudicial effect outweighed any probative value it may have had.

At trial, before going any further, the trial court should first have made a determination that the alleged statement to Carla Brave was relevant. There is nothing in the record from which we can determine if the trial court concluded that the alleged statement was relevant to any issue in the case. It is true that the prosecution argued that it shows defendant's state of mind as desiring to have sex with Carla Brave. (But even if true, that fact, as will be explained later, had nothing to do with issues at trial.)

It is clear here, that the state admitted (at least to the trial judge in chambers) that defendant had not in fact been

convicted of rape. This being so, the trial court had the further duty of determining the likelihood of defendant having made the statement to Carla Brave. In the nature of things, a person does not normally go around exclaiming to the world that he has been in prison for rape. Particularly would this be so when such is not the fact. Clearly the probabilities were that defendant did not make this statement to Carla Brave at all. It could be that she was deliberately not telling the truth or that she had misinterpreted what defendant had stated to her. She admitted that she had not revealed this in her statement first given to the prosecution--and the statement extensively covered the events of the evening--including the conversation she had with defendant in his pickup truck.

Given this situation, the prejudice to defendant was manifest. There was a strong probability that defendant did not make this statement but if the jury heard the evidence they might get the idea that defendant, in stating he had been in prison for rape, was in fact implying to Carla Brave that if she did not go along with his desire for sex that he would force her. The further implication from this is that the state was implying that defendant was an evil person and would stop at nothing to have his way--including taking of another person's life. But the fact is that the circumstances of the shooting had nothing to do with any alleged statement made to Carla Brave that defendant had been in prison for rape.

The events of the evening of the shooting did not transpire at one time. There was a great deal of drinking by all parties concerned throughout the evening and the alleged statement of defendant to Carla Brave took place a considerable time before the shooting. There is not a shred of evidence that

-23-

the alleged statement had any connection directly or indirectly with the shooting. If defendant had a desire to have sex with Carla Brave, Gardipee was not aware of his desires. There is no evidence that Gardipee knew what defendant and Carla Brave talked about. Indeed, the evidence is that he did not. Under these circumstances, the desire of defendant to have sex with Carla Brave is totally unrelated to his willingness to take Gardipee's life. Moreover, the circumstances of the assault upon defendant leading to the shooting are totally unrelated to any desire of defendant to have sex with Carla Brave.

The fight in the pickup truck while defendant was driving Carla Brave and Gardipee back to town, was instigated solely by Gardipee. Gardipee suddenly started getting wild about the loss of his ancestral rights and in the process started pounding on defendant while defendant was driving the truck down the road. It is not at all difficult to understand why defendant stopped his truck, got out, and climbed into the back of the camper. Whatever reasons Gardipee had for pounding on the defendant, they certainly did not relate to any knowledge Gardipee had of the conversations defendant had with Carla Brave. Nor does the alleged statement by defendant to Carla Brave have any connection to defendant's state of mind when he stopped his truck and climbed into the back of his camper in order to avoid Gardipee's assault. It is difficult for me to see how defendant had sex on his mind at that time.

The only purpose for the prosecutor / to elicit the statement from Carla Brave was to put defendant in as bad a light as possible in the eyes of the jury. To a degree, this is always the objective of the prosecution, but there must be a sound evidentiary basis for doing so. Here there was none. The testimony was not relevant and was clearly prejudicial.

-24-

I would also reverse the conviction because the trial court failed to instruct the jury on the elements of deliberate homicide and mitigated deliberate homicide. The jury was only given a definition of deliberate homicide and mitigated deliberate homicide; it was not provided with instructions setting forth the elements of deliberate homicide and mitigated deliberate homicide, and telling them that each of the elements must be proved beyond a reasonable doubt. Without such instructions the jury did not know what the elements of mitigated deliberate homicide were and the burden of proof required to prove each element. I cannot conceive that a trial court would allow a case to go to a jury without such instruction, nor can I conceive how an appellate court would give its stamp of approval.

The duty to instruct the jury on the law, has been stated as follows in McBride, The Art of Instructing the Jury (1969, Anderson Publishing Company) (quoting from California Jury Instructions, Criminal, page 8):

> "'In recent years we have witnessed a distinct trend of decision away from the rule of earlier days when it was held not to be error for a court to fail to instruct the jury, in the absence of a request, on even such vital rules as those of reasonable doubt and self defense. This later trend has established as a basic principle that the trial judge has the duty, even in the absence of request, to instruct the jury as to all rules of law that necessarily will be involved in a decision of the cause. People v. Holt, 25 Cal. 2d 59, 153 P.2d 21, 24. We do not have sufficient modern precedents to enable us to make a complete list of the instructions that must be given, in the absence of a request therefor, under the modern rule. Generally the trend points to the likelihood of reversal of a conviction if the trial court fails to give any proper and appropriate instruction which, were it given, might result in a different verdict. In instructing jurors, we must assume that they have no knowledge of the rules of law and that, therefore, they must be instructed on all points of law which, under any reason-

-25-

able theory, might be involved in their
deliberations, to the end that their
decision will be according to the law
and the evidence and untinged by any
private and possibly false opinion of
the law that they may entertain.'"
(Emphasis added)

Under any view of a case, the elements of the offenses

charged will be involved in a decision of the cause. The

failure to instruct the jury on those elements must be

reversible error.

It appears that this Court is holding that the duty

to properly instruct the jury can be delegated to counsel--

and if the trial court does so, he is relieved of any burden

either for erroneous instructions submitted to the jury or for

failure to instruct the jury on important aspects of the case.

While the failure of counsel to submit instructions on the

important aspects of the case is surely a sign of ill-prepared-

ness, I fail to see how this relieves the trial court of a duty

to properly instruct the jury. This is a situation where the

jury was not instructed on the essential elements of the offense

for which defendant was convicted. The duty is not only that

of defense counsel to see that proper instructions are prepared

and offered for the court's consideration; there is a correspond-

ing duty on the state to see that the jury is instructed on the

essential elements of the offenses charged. But regardless of

which side provides the instructions, or is derelict in not

providing the instructions, the ultimate duty to fairly instruct

the jury on the law resides with the trial judge. If he does

not receive proper instructions he should refuse to send the

case to the jury until he is convinced he has the proper

instructions. I cannot believe that the only duty of the trial

judge is to accept or reject the instructions which are offered

to him by counsel for both sides. If instructions are either

-26-

improperly worded, or are omitted, he should direct counsel to properly word the instructions or to supply the omitted instructions. Only then can we say that the trial judge has properly discharged his obligations to the law. That was not done in this case.

_____
Justice