**STATE of Maine**

v.

**David M. EATON.**

Supreme Judicial Court of Maine.

Sept. 11, 1973.

David W. Kee, County Atty., Samuel Nesbitt, Jr., Asst. County Atty., Ellsworth, for plaintiff.

Hale & Hamlin by Barry K. Mills, Blue Hill, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

DUFRESNE, Chief Justice.

The defendant, David M. Eaton, at the September term of the Superior Court in and for the County of Hancock was charged by indictment dated September 2, 1971 with the crime of assault with a dangerous weapon with intent to kill one James D. Haines under 17 M.R.S.A. § 2656.[1] Tried by jury, he was convicted of the offense charged and on October 1, 1971 the presiding Justice sentenced him to serve a term of not less than ten years and not more than twenty years in Maine State Prison. Eaton appeals from this conviction. We deny the appeal.

James D. Haines was in his third year of medical school at the University of Michigan. He left Ann Arbor, Michigan on a vacation trip with his wife, Sherri, intending to visit the State of Maine. They left Boston, Massachusetts in the late

---

1. 17 M.R.S.A. § 2656. Assault with intent
 "Whoever assaults another with intent to murder or kill, if armed with a dangerous weapon, shall be punished by imprisonment for not less than one year nor more than 20 years; when not so armed, by a fine of not more than $1,000 or by imprisonment for not more than 10 years."
 [The Legislature in 1971, by Public Laws, 1971, c. 539, § 16 increased the penalties for the crime of assault with intent to murder or kill, if armed with a dangerous weapon, to a minimum of 2 years and a maximum of 25 years in Maine State Prison. It also provided that the imposition or execution of such sentence shall not be suspended and probation shall not be granted. This change in the law became effective on September 23, 1971 after the reference crime in the instant case was committed.]

morning or early afternoon of July 17, 1971. Mrs. Haines testified:

"We had never been to Maine before, and we didn't have any place to go, but were very interested in Maine. We just looked at the map, and pinpointed a stop and said that looks like a good place to go for a rest, so we decided to go there."

That spot in Maine fingered on that map was Stonington, where events stranger than fiction were about to happen which, unknown to the Haines, would change the scenario from the restful atmosphere of a small town in the wilds of Maine to the most frantic scene of an ancient wild-west movie.

Indeed, in the evening of July 17, 1971 the defendant was attending a dance in Stonington. He had been brought up in that town and his family lived there. It was to be expected that, following his service of a minimum sentence in Maine State Prison, he would return to the place of his childhood, which he did some few weeks previously when he was released on parole from that institution.

Eaton was drinking that evening, contrary to the terms of his parole. Aggressive and cantankerous, he got himself involved in a fight with another man at the dance.

Eaton had been in trouble in the past because of liquor. At the time of his previous sentence to prison, his relationship with one Starr Dorr had become strained because of his excessive drinking and the bond of affection which had marked their prior acquaintance had reached the breaking point. The dissolution was formalized when Miss Dorr dispatched a letter from Stonington to the prison informing the appellant she would not see him again. Eaton did not take this rejection seriously and his feelings for Miss Dorr intensified during the remainder of his prison term, so much so that at the time of his release on parole he harbored the thought that he could convince her to renew their former relationship.

However, in the meantime Miss Dorr had been actively engaged in a new friendship, and, in the evening of July 17, 1971 her fiancé was at her mother's house on Indian Point Road in Stonington where she and many friends were attending a party. Eaton knew this and, following his altercation at the dance, decided that he better have a talk with Starr Dorr.

After breaking into a local store to arm himself with a 30-30 rifle and several boxes of ammunition, he visited the trailer home of Mrs. Arlene Jones, from which point in the town he telephoned the Haskell residence. He reached Mrs. Haskell, Miss Dorr's mother, and, in the presence of Mrs. Jones and one Norman Joyce, Eaton's closest friends, he made threats over the phone to Mrs. Haskell and Miss Dorr. The clock was about to strike 12:00 o'clock midnight when Eaton made these threats. They were admitted in evidence, over objection, and their contents were described as follows:

"I've got a 30–30 here."—"He said that he had a 30–30 and he was going to blow the house apart."—"He said [to Miss Dorr] I have a 30–30, are you going for a walk?"

Dropping the telephone, Eaton left the Jones' home for the Haskell residence, which fronted on Indian Point Road. Jerome Shepard, a guest at the party, was the first one to encounter the appellant, who pointed the end of the barrel of the gun at his head while ordering him to "go in and get Starr." When Shepard grabbed the gun, he was warned: "Don't frig with my gun, boy. I'd just as soon shoot you as look at you [and] if you don't go in and get Starr and get her out here, I'm going to clean up house."

Edgar Ray, another guest, came out later to talk to Eaton, but he was rebuked in the same manner. Pointing the rifle at Ray's stomach, Eaton told Ray that he should go in and get Starr and send her out or that he'd start shooting.

Ronald Hutchinson, a guest at the Haskell residence, who wanted to talk Eaton out of his threatening mood, was told to keep his distance, that he had come far enough. Stopping some 10 feet away from the rifle pointed at his stomach, Hutchinson, who had known Eaton in the past, heard him blurt out that he loved Starr Dorr, that she was tearing his heart apart, that he wanted to talk with her first, but then was going to kill her. Several volleys of bullets riddled the building and convinced the merrymakers that this party-crasher was not bluffing. Some "hit the floor," while others hid in closets or exited from the house to reach the safety of the woods.

Archie Hutchinson, Jr. was no more successful in persuading Eaton to desist from his intended plan to get Starr Dorr out of the Haskell residence than the other guests had been. He was warned that he better go in the house and bring Starr out or they would be going to his funeral on the morrow.

The Haines' car then appeared on the scene. Eaton fired a shot toward the vehicle as it came up in the distance. The car, however, continued on and when it reached a point in the road directly abreast of the position where Eaton was standing, he again fired at the automobile which then slowed down uncontrolled with Mr. Haines falling out of the car to the street screaming "I've been hit." Mrs. Haines stopped the automobile by putting on the emergency brake and ran out to her husband's side. Eaton then told Mrs. Haines that he just meant to blow the air out of the tires, but did not want anybody on the street, adding something about his girl friend that Mrs. Haines could not remember. Eaton's second shot at the car had hit Mr. Haines in the stomach, seriously injuring him.

The defendant contends that the Justice below committed reversible error when he ruled relevant and admissible the numerous threats made by Eaton to a number of persons other than Mr. Haines prior to the time when the Haines automobile came into view. The State argues that all these threats were relevant evidence to show that Eaton at the time of the shooting at the Haines' car was harboring the actual subjective specific intent to kill, which is a constituent element of the crime of assault with intent to kill and which must be proved beyond a reasonable doubt before conviction can be had. Bessey v. State, 1972, Me., 297 A.2d 373, 376.

 It is a general canon of evidence that any fact tending to elucidate a fact in issue is admissible into evidence unless its admissibility is precluded by some specific rule of exclusion. State v. Fitzherbert, 1969, Me., 249 A.2d 760. Evidence, however, is inadmissible if its sole relevancy is to establish bad character or propensity to commit crime on the part of the accused.

 The general character of the accused for wrongdoing is not in issue in a criminal prosecution against him for the commission of a specific crime unless and until he brings it into the trial and makes it an issue by introducing evidence of good character and reputation. When admissible, character evidence is limited to evidence of reputation for certain traits of character and cannot be shown by specific acts of wrongdoing. State v. Wyman, Me., 1970, 270 A.2d 460, 463. The rationale behind the rule has been well stated in *Wyman*, supra:

"The reason for the rule of exclusion lies in the tendency of triers of fact to give excessive weight against the accused respecting any specific illegal activity. It further tends to confuse the jury concerning the main issue of guilt or innocence of the offense charged and calls upon the accused to account for past wrongdoings for which he is not being tried. The main thrust of such evidence, such as other unrelated wrongful acts of the accused, is to pollute the minds of the jury against the defendant. State v. Garceau, [122 Vt. 303, 170 A.2d 623] supra. 'If such testimony should be admitted, the defendant might be over-

whelmed by prejudice, instead of being tried upon the evidence affirmatively showing his guilt of the specific offense with which he is charged.' City of Topeka v. Harvey, 1961, 188 Kan. 841, 365 P.2d 1109."

■ On the other hand, evidence that is otherwise competent and relevant to prove a defendant's guilt of the particular crime charged is not made inadmissible by the fact that it also discloses guilt of another distinct crime. State v. Castonguay, 1970, Me., 263 A.2d 727.

■ Generally speaking, evidence of antecedent threats is admissible when they are directed at the victim for whose assault the defendant is being prosecuted or at a class to which the victim belongs. State v. Doyon, 1966, Me., 221 A.2d 827; State v. Garcia, 1971, 83 N.M. 51, 487 P.2d 1356; Sikes v. State, 1971, Fla.App., 252 So.2d 258; Miller v. State, 1924, 20 Ala. App. 354, 102 So. 153.

■ But the ultimate test of admissibility is relevancy. Relevant evidence will not be excluded merely because it relates to facts which point to the commission of separate crimes. Williams v. State, 1959, Fla., 110 So.2d 654. See, Torrey v. Congress Square Hotel Co., 1950, 145 Me. 234, 75 A.2d 451.

■ Evidence revealing other crimes is admissible if it casts light upon the character of the act for which the defendant is being prosecuted by showing motive, intent, absence of mistake, common scheme, identity or a system or general pattern of criminality so that the evidence of the prior offenses would have a relevant or a material bearing on some essential aspect of the offense being tried. Talley v. State, 1948, 160 Fla. 593, 36 So.2d 201. Relevancy of evidence is dependent on probative value and the determination whether evidence is relevant and material must necessarily rest largely in the sound discretion of the presiding justice as of the time it is

offered. McCully v. Bessey, 1946, 142 Me. 209, 49 A.2d 230.

From all the facts and circumstances disclosed by this record, one must necessarily conclude that the defendant had nurtured in prison an intense passionate flame for Starr Dorr and that on the night of July 17 to July 18, 1971 his emotions were so stirred up under the influence of intoxicating beverages that he became extremely bitter about this party at which in his own murky mind he surmised his girl friend and her fiancé were getting along too well. One must infer fom the evidence that Eaton had a single purpose in mind: he would have a heart-to-heart talk with Starr Dorr that night or else, and anyone who in any way might attempt to interfere or failed to lend a hand would be in jeopardy of his life. This single purpose thinking imbedded in an attitude of violence toward all who came in contact with the defendant from the time of his telephone conversation with Mrs. Haskell and Starr Dorr to the actual assault on the Haines was ever present in his mind without interruption. The various threats to the several people, the shooting up of the Haskell residence, the attack upon the oncoming vehicle were all acts displaying, not ill-will against any particular person, but rather an intent to intimidate, even kill, to accomplish his fixed design.

In State v. Fenlason, 1886, 78 Me. 495, 7 A. 385, prior threats to burn a building were admissible, even though ownership of the property changed between the making of the threats and the burning, the Court saying:

"The evidence would still have some tendency to prove some element of the crime charged, the act, the intent, the malice, or at least the disposition of mind of the respondent."

■ Previous threats made and assaults committed by the defendant are admissible in evidence where there is a close logical connection with the crime charged in the in-

dictment such as shedding light upon the motive or intent of the defendant or where such evidence forms part of a single chain of facts so intimately connected that the whole must be considered in order to interpret its several parts. State v. Whitley, 1969, 17 Ohio App.2d 159, 245 N.E.2d 232.

 Where the intent of a party is an ingredient of the crime charged, evidence of conduct of a similar nature may be introduced to establish the intent of the defendant in doing the acts undergirding the charge, provided such conduct has a natural tendency to show such intent. We said in State v. Wyman, supra:

" [E]vidence of conduct of precisely similar nature to that charged, even though not connected with it and inadmissible as such to prove the commission of the act involved in the substantive charge, is uniformly received for the limited and specific purpose of aiding to determine the quality of the act and the legal character of the offense by illustrating the intent with which the act was committed."

In the instant case, the previous threats and the several assaults on all the people in and around the Haskell residence demonstrate beyond any reasonable doubt the single purpose which Eaton harbored at all times that he was going to see, and talk to, Starr Dorr that night and that he would not stand for non-cooperation or interference on the part of anyone, including any person driving toward the area of the Haskell home.

Evidence having a legitimate tendency to shed light upon the intent or mental attitude of a defendant at the time he committed the acts of which he is charged is relevant and material when such mental state or operation is a constituent part of the crime charged and is a necessary ingredient of the State's case or the accused's defense. The previous threats and assaults in the instant case were part of a single set of circumstances, closely re-lated in nature and time, all linked together by a common purpose, and they served in logical sequence to activate the mind and body of the defendant in perpetrating the assault with intent to kill James D. Haines, of which the defendant was convicted.

As stated in State v. Smith, 1971, Me., 277 A.2d 481:

"Where the acts showing the commission of the substantive offense of the crime against nature were all so closely related in point of time and place and so intimately associated with the acts evidencing the offense charged that they formed together a continuous transactional episode, the whole event could be shown, including what immediately preceded and what immediately followed the act complained of, *for the purpose of showing the intent of the accused.*" (Emphasis added.)

There was no error below and the entry will be

Appeal denied.

WEBBER, J., sat at argument but retired before this opinion was adopted.

All Justices concurring.