No. 14542

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

HOWARD L. BASHOR,

Defendant and Appellant.

Appeal from: District Court of the Ninth Judicial District,
In and for the County of Toole,
Honorable R. D. McPhillips, Judge presiding.

Counsel of Record:

For Appellant:

Conner, Baiz and Olson, Great Falls, Montana
Dennis P. Conner agrued, Great Falls, Montana

For Respondents:

Hon. Mike Greely, Attorney General, Helena, Montana
Mary B. Troland argued, Assistant Attorney General,
Helena, Montana
Marc Racicot argued, Assistant Attorney General, Helena,
Montana
Rae Kalbfleisch argued, County Attorney, Shelby, Montana

Submitted: March 25, 1980

Decided: JUL 1 - 1980

Filed: JUL 1 - 1980

*Thomas J. Kearney*  Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Defendant Howard L. Bashor appeals from his conviction by a jury in Toole County of the crime of deliberate homicide.

This case arose out of the death of James Hurley. It is undisputed that Hurley died of a gunshot wound and that defendant fired the fatal shot. The parties, however, present conflicting versions of the events which led to Hurley's death.

The State's version is that Hurley, Marian Irgens, Duane Enneberg, and Jeanette Frost visited a bar in Kevin, Montana, on the evening of December 2, 1977. During the evening, Marian Irgens twice observed defendant's car being driven down the street next to the bar. At approximately 1:30 a.m. of December 3, the group decided to leave the bar. As they left, they noticed defendant's car parked a short distance away with the headlights on. They saw William Schaeffer, a friend of defendant, standing in front of the car, hollering at them in a belligerent manner. The four friends began to get into Hurley's car, but the hollering continued. Finally, Hurley and Enneberg started walking in the direction of defendant's car. As Enneberg and Hurley approached, Schaeffer confronted Enneberg in front of the car. Hurley proceeded toward the driver's window. The defendant was sitting in the driver's seat. A few seconds later a shot was heard, and Hurley walked away from the car saying, "I've had it." He died shortly thereafter.

Defendant's version is that he and Schaeffer had noticed Hurley's car at the Kevin bar during the early morning hours of December 3, 1977, and decided not to go inside until Hurley and his friends had left. Hurley approached defen-

dant's car while Schaeffer was still sitting in the passenger's seat of the car. Defendant rolled down his window and at about this time, Schaeffer got out on his side of the car and began to walk around to the front of the car. Meanwhile, Hurley reached into the driver's window and began trying to pull defendant out of the car. Fearing that his eye, which had been operated on the previous summer, would be permanently damaged in a fight, defendant took his gun from the car console and fired at Hurley.

Prior to trial Schaeffer underwent a polygraph examination. His answers were to the effect that Hurley had been the aggressor in the altercation. The operator of the polygraph testified that he was satisfied as to the truthfulness of Schaeffer's answers. The State filed a motion in limine seeking to prohibit defendant from entering or attempting to enter into evidence the polygraph examination. The motion was granted.

The defendant raises nine specifications of error:

1. Whether the trial court erred in denying defendant's motion for change of place of trial?

2. Whether the trial court erred in denying defendant's challenge to the jury panel and in denying defendant's challenge to juror Pettigrew for cause?

3. Whether the trial court erred in failing to properly hear and consider defendant's offer of proof concerning the polygraph examination of witness Bill Schaeffer?

4. Whether the trial court erred in ruling that the examination of Bill Schaeffer was inadmissible as a matter of law?

5. Whether the trial court erred in refusing admission of the polygraph test given Bill Schaeffer?

6. Whether the trial court erred in denying defendant's motion to set aside the verdict because of prejudicial remarks made by the special prosecutor in his closing argument?

7. Whether the trial court erred in permitting the State to place into evidence acts, statements and circumstances occurring prior to December 2, 1977?

8. Whether the trial court failed to fairly and fully instruct the jury on the law of self-defense?

9. Whether the trial court erred in not instructing the jury on the lesser included offenses of mitigated deliberate homicide and negligent homicide?

In the present case the defendant moved for a change of place of trial based on inflammatory pretrial publicity and general bias against him in Toole County. Defendant and the State each submitted affidavits on the matter, and a hearing was held on the motion in District Court. The judge reserved his ruling on the issue pending the outcome of voir dire examination, at the conclusion of which he denied defendant's motion. Defendant contends this denial constituted reversible error.

Section 46-13-203(1), MCA, provides that a defendant "may move for a change of place of trial on the ground that there exists in the county in which the charge is pending such prejudice that a fair trial cannot be had in such county." A motion for change of venue is addressed to the discretion of the trial court, and a denial is not reversible error in the absence of an abuse of discretion by the trial court. State v. Kirkaldie (1978), ___ Mont. ___, 587 P.2d 1298, 1303, 35 St.Rep. 1532, 1537; State v. Lewis

(1976), 169 Mont. 290, 295, 546 P.2d 518, 521. In State v.

Board (1959), 135 Mont. 139, 143-144, 337 P.2d 924, 927,

this Court said:

> "Indicia of this denial of fair trial, resulting
> from prejudicial publicity, as gleaned from our
> law, seems to be: Arousing feelings of the
> community, threat to personal safety of defen-
> dant, established opinion of members of the
> community as to the guilt of the accused, news
> articles beyond the objectivity of news print-
> ing and dissemination, State v. Dryman, 127
> Mont. 579, 269 Pac.(2d) 796, and difficulty or
> failure in securing a fair, impartial jury
> from the community in which the news articles
> appeared, State v. Davis, supra, 60 Mont. 426,
> 199 Pac. 421; State v. Bess, 60 Mont. 558, 199
> Pac. 426.

> "Our court looks for a chain reaction. It
> starts at the basic premise that the accused
> is entitled to a fair trial. Next it checks
> the publicity complained of, as to its con-
> tents and more important, as to its total ef-
> fect upon the 'fair trial right.' Further it
> looks at effects in the form of the discrimi-
> nating marks we have discussed. Finally, it
> objectively considers the end result--was a
> fair trial denied as a result of the publi-
> city and its effects? If its findings are
> negative it refuses to find abuse of discre-
> tion on the part of the trial court."

The news items of which defendant complains consisted

of a newspaper article appearing on Friday, December 9,

1977, and a statement on the local radio that was made a day

or two after the shooting. The newspaper article had the

headline: "Bashor Charged with Deliberate Homicide in

Shooting." The first two paragraphs of the article read as

follows:

> "Shades of the old west were re-enacted at Bert's
> Bar in Kevin early Saturday morning, when a bar
> patron was shot down and killed, at about 1:15.

> "According to reports, James F. Hurley, 41, was
> inside the bar when Howard 'Ozzie' Bashor, 56,
> drove up and sent word inside for Hurley to come
> outside. Hurley walked outside and was shot
> down."

-5-

Defendant contends that the article insinuates he shot Hurley in cold blood. The State agrees that the article was an incorrect statement of the facts. However, a misstatement of facts in a single newspaper article does not necessarily constitute sufficient grounds to change venue. In State v. Bess (1921), 60 Mont. 558, 199 P. 426, this Court said that newspaper articles may not be the basis of a change of venue unless the articles ". . . were passionate enough to excite undue prejudice, to the extent of rendering it impossible for an accused to secure a jury free from exception." 60 Mont. at 569, 199 P. at 429. In State v. Sandstrom (1978), ___ Mont. ___, 580 P.2d 106, 35 St.Rep. 744, rev'd on other grounds, Sandstrom v. Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39, this Court said that "[p]ublished accounts of crimes are not considered prejudicial unless so passionate as to excite undue prejudice, rendering it impossible to empanel a trial jury free from prejudice against the defendant." 580 P.2d at 108, 35 St.Rep. at 746.

The article complained of states that the defendant ". . . sent word inside for Hurley to come outside." This is the only statement which is actually contrary to the undisputed facts. The article only appeared once, and this was six months before the trial. To justify a change of venue not only must an article be adverse to the defendant, it must also make it impossible to empanel a fair jury.

During the examination of prospective jurors, each person who eventually sat on the jury stated either that they had not read the article at all or that they could not remember any of the details other than that someone had been shot, or that they could put aside any prejudice and judge

the case solely on the evidence presented. The article is not the impassioned type of news item which will justify a change of venue. Under the circumstances the jury could not have been influenced by the article in any event. Consequently, the article did not present a sufficient basis for granting a change of venue.

The radio broadcast of which the defendant complains contained the statement that the victim ". . . was apparently shot as he was leaving a Kevin tavern." The defendant contends that this statement, when taken in conjunction with the newspaper article, suggests that the victim was shot in cold blood.

A reading of the record indicates that Hurley was shot shortly after he left the tavern. Neither party disputes this fact. The radio report was simply a factual report of the homicide. When news accounts are not editorialized reports and they appear to be factually done and no inflammatory statements appear, there is no abuse of discretion in denying a defendant's motion for change of venue. See State v. Bischert (1957), 131 Mont. 152, 156, 308 P.2d 969. Based on these news accounts there was no error in denying the motion.

The defendant also based his motion for change of venue on his assertion that the community in Toole County harbored a bias against him, making it impossible to receive a fair trial therein. The affidavits and testimony at the hearing on change of venue are largely contradictory opinions concerning whether defendant could have a fair trial in Toole County. The affidavits supporting a change of venue indicate threats against defendant's brother, the caretaker of defendant's property, and the justice of the peace who had a

pending motion to admit defendant to bail. The threats were made anonymously by telephone calls, by patrons at bars, and in one instance, directly to the caretaker by a friend of the victim while in a bar. Certain members of the community testified that there had been a lot of talk in the county to the effect that defendant was guilty. The people who testified for the State on the venue motion said that most of the talk had died down shortly after the shooting, that the community was not biased against the defendant, and that he could receive a fair trial in Toole County.

As indicated by the quote from State v. Board, supra, our basic concern is to insure that the level of community bias did not reach a point where the defendant could not secure a fair trial. In analyzing the facts, we must consider all of the indications of prejudice, including the news releases mentioned above. In determining the level of community bias which will justify a change of venue, it is helpful to consider the cases of State v. Spotted Hawk (1899), 22 Mont. 33, 55 P. 1026, and State v. Dryman (1954), 127 Mont. 579, 269 P.2d 796.

In Spotted Hawk a sheepherder had been murdered, and the white citizens of the county suspected members of an Indian tribe who lived on a nearby reservation. The defendant was a member of the tribe. The defendant moved for a change of venue based upon affidavits which showed the degree of community prejudice. Examples of this prejudice were: 200 armed men who gathered near the Cheyenne Indian Agency demanding the murderer and threatening to exterminate the tribe if he was not handed over; an oath taken by a large number of men that they would take the law into their own hands if the murderer were acquitted and would take

-8-

vengeance upon the court and counsel in case of acquittal; and newspaper reports made during a five-week period which tended to excite the readers by extravagant and inflammatory accounts of the murder and of the current trouble between whites and Indians. The District Court refused to grant a change of venue, and the defendant was convicted. This Court reversed because of the obvious bias in the community and made the following observation:

> "'. . . Jurors, witnesses and officers cannot be insensible to a strong and excited public feeling and sentiment concerning the trial that is going on, and are liable to be influenced by it, unconsciously, and with an honest intention of doing their whole duty. The court room is a public place, and a trial, in which a community is deeply interested, brings the people there; and the pressure of their presence and feeling is a strong argument, and almost irresistible, one way or the other. The influence of their presence, and the expression of their interest in the event of the trial, in divers ways, might give a false coloring to the testimony, or warp and bias the judgment in weighing and considering it.' (Kennon v. Gilmer, 5 Mont., at page 264, 5 P. 850.)" 22 Mont. at 56.

In Dryman, supra, the defendant had pleaded guilty to a homicide charge and then had asked to withdraw his plea. The trial court refused to allow the withdrawal, but this Court allowed him to withdraw the plea and ordered a new trial. The defendant then asked for a change of venue based in part upon a news article that had appeared in the county. This article had a picture of the defendant captioned "KILLER." The article used phrases describing the defendant as a "cold blooded killer" and ". . . it appeared he was so steeped in criminal tendencies that nothing could appeal to his warped and stony mind." The article described the homicide as ". . . the most dastardly deed in the history of Toole County . . ." The District Court denied the motion for change of venue, and the defendant was convicted. This

Court reversed, saying that the record revealed a "wide-spread and deep-seated opinion in Toole County . . . that defendant is guilty. . ." 127 Mont. at 590.

The bias presented in the instant case does not reach the level of that presented in Spotted Hawk and Dryman. The affidavits lack any convincing quality that the feelings of the members of the community were aroused to the point where the defendant could not receive a fair trial. The examples of prejudice were obviously genuine, but most of it appears to be in the nature of isolated outbursts by people who were connected with the victim. The news articles in this case are not of the outrageous quality presented in Dryman, supra.

The evidence of prejudice presented by the defendant is inconclusive. In such circumstances, the trial judge's discretion must be relied upon. In this case the judge took the change of venue motion under advisement until the voir dire examination of the jury. It was not until after voir dire that the motion was denied. From our review of the record we do not find countywide prejudice which would preclude a fair trial. In view of the conflicting testimony and affidavits and the District Court's opportunity to personally observe the voir dire examination of the prospective jurors, we find that there was no abuse of discretion in denying the change of venue motion.

Defendant next contends the trial court erred in denying his challenge to the jury panel as a whole and to juror Pettigrew specifically. This Court has held that the right to trial by an impartial jury is an unqualified one. State v. Brooks (1920), 57 Mont. 480, 487, 188 P. 942.

In the present case approximately sixty prospective jurors were examined before twenty-eight positions were filled from which the final twelve trial jurors were selected. Twenty-nine prospective jurors were excused for cause. The State and defendant each used nine peremptory challenges. Defendant alleges that these large numbers indicate the difficulty of securing an impartial jury. The pertinent inquiry is, however, whether the jury as empaneled were able to render an impartial judgment based solely upon the evidence presented at trial.

Defendant's arguments concerning the bias and partiality of the jury amount in large part to speculation as to the hidden pressures and prejudices of the jury members. Defendant alleges that certain jurors were closely connected with law enforcement personnel or had some connection with the victim. The State correctly points out that the trial judge allowed both parties wide latitude in examination of the jurors and permitted individual questioning of each prospective juror in chambers. All of the jurors who finally sat at the trial stated under oath either that they would judge defendant solely on the evidence presented and that they could put aside any opinions they might have formed, or that they had no opinions in the case, or that they understood a person is presumed innocent until proven guilty.

> "In the examination of a juror to determine his competency the trial court is in a peculiarly advantageous position from observing his demeanor, his expression and his manner in answering questions." State v. Simpson (1939), 109 Mont. 198, 207, 95 P.2d 761, 764.

In State v. Borchert (1970), 156 Mont. 315, 320, 479 P.2d 454, 457, this Court stated that a trial judge's decision as to the impartiality of a jury should not be set

-11-

aside unless there is a clear abuse of discretion. In speaking of the level of juror prejudice which would mandate the disqualification of a juror, this Court said:

> "It is only where they form fixed opinions on the guilt or innocence of the defendant which they would not be able to lay aside and render a verdict based solely on the evidence presented in court that they become disqualified as jurors." Great Falls Tribune v. District Court (1980), ___ Mont. ___, 608 P.2d 116, 120, 37 St.Rep. 502, 506.

As noted above, each juror gave an assurance of impartiality. In addition, the trial judge made cautionary remarks to the jury that they had a duty to lay aside their opinions and impressions. Under these circumstances the trial judge did not abuse his discretion by denying defendant's challenge to the jury panel.

The defendant assigns as error the District Court's denial of the challenge for cause of juror Pettigrew. Mrs. Pettigrew was the dancing instructor of Donna Hurley, the daughter of the victim. Donna testified at trial. During voir dire examination Mrs. Pettigrew testified as follows while being questioned by defense counsel:

> "Q. Do you think you could be a fair and impartial juror in this case? A. Well, no, I really don't think I can.
>
> "Q. You can't give your positive assurance that you could give Mr. Bashor a fair trial? A. There's a question about it, so I guess my answer is no.
>
> "Q. You can't give us your positive assurance? A. No."

The court then conducted the following inquiry:

> "Q. You said previously to Mr. Conner that you didn't think you could be a fair juror. Explain what you mean or what your thoughts are on that, and just why you think this. A. Okay. Mr. Kalbfleisch, when he asked me, was asking if I could do this on the facts, you know, of the case, and I really think I can. The other lawyer was questioning on my emotions, and those are two different things.

"Q. Undoubtedly you will be instructed that if you were to serve as a juror in this case the case must be decided upon the evidence presented in the courtroom-- A. Yes.

"Q. --and that you are not to decide this case on sympathy, conjecture, or any other thing. Now would you be able to follow an instruction of that nature? A. Yes, I really think I could because even though I would feel sympathy or emotion my conscience would not let me. I would still have to be fair when it came to choosing.

"Q. You think you could be a fair juror? A. Yes, I think I could.

"Q. I gather what you are saying is that you are a compassionate person, but a fair person also? A. Yes."

This Court has previously considered a similar problem. In State v. Juhrey (1921), 61 Mont. 413, 202 P. 762, a proposed juror had stated that he had already formed an opinion about the case based on a newspaper article. He also stated, however, that he would base his opinion as to defendant's guilt upon the evidence presented at the trial. This Court noted that during voir dire this juror had ". . . made statements which, if standing alone, would indicate a fixed opinion amounting to prejudice." The Court went on to say:

". . . where the evidence relating to the qualifications of a juror is in conflict, it is the function of the trial court to pass upon that evidence and determine the qualification of the juror, and this determination of the trial court is final, unless it appears from the record that there has been some abuse of discretion." 61 Mont. at 421.

In the instant case the juror gave answers to defense counsel which, if standing alone, would indicate that she could not give a fair opinion in the case. When questioned by the judge, however, Mrs. Pettigrew made it clear that she could put her emotions aside and judge the defendant fairly and solely upon the evidence presented at trial. As in

-13-

Juhrey, the District Court did not abuse its discretion in refusing the challenge for cause.

Prior to defendant's trial, the State made a motion in limine to prevent the introduction of expert testimony regarding the results of a polygraph examination taken by William Schaeffer. The motion was granted. Defendant attacks the ruling on three grounds: (1) The trial court erred in refusing to hear defendant's offer of proof on the polygraph; (2) the trial court erred in ruling that the proposed testimony was inadmissible as a matter of law; and (3) the trial court erred in refusing admission of the particular polygraph-related testimony offered by defendant. These three grounds will be disposed of in the following discussion.

The questions and answers during the polygraph examination were:

"Question No. 1:  Is your last name Schaeffer?

"Answer:          Yes.

"Question No. 2:  Was Ozzie [defendant] looking for Jim on that night?

"Answer:          No.

"Question No. 3:  Are you now in Great Falls?

"Answer:          Yes.

"Question No. 4:  Did you see the gun at any time?

"Answer:          No.

"Question No. 5:  Is your hair brown?

"Answer:          Yes.

"Question No. 6:  Did you know if Ozzie ever got out of his vehicle at any time?

"Answer:          No.

"Question No. 7:  Are your eyes hazel?

"Answer:          Yes.

"Question No. 8:    Did you see Ozzie fire the gun?

"Answer:           No.

"Question No. 9:    Regarding this case are you
                    telling me the complete truth?

"Answer:           Yes.

"Question No. 10:   Did Jim start the altercation?

"Answer:           Yes.

"Question No. 11:   Are you 37 years old?

"Answer:           Yes.

"Question No. 12:   Other than what you said did
                    Ozzie say anything about the
                    shooting?

"Answer:           No.

"Question No. 13:   Are you covering up for Ozzie
                    in any way?

"Answer:           No."

These answers corroborate the story which defendant gave to the law enforcement authorities. This testimony could conceivably have helped defendant by showing Hurley as the aggressor and the defendant as a victim, thereby lending credence to the self-defense theory.

The trial judge ruled that as a matter of law the testimony of the polygraph examiner was inadmissible. If this ruling was correct, it was not error for the District Court to refuse to consider defendant's offer of proof or for it to refuse to admit into evidence this particular area of testimony and evidence.

In State v. Hollywood (1960), 138 Mont. 561, 358 P.2d 437, the defendant had attempted to introduce polygraph tests in District Court by laying a foundation as to the accuracy of the tests and the qualifications of the examiner. The District Court refused to admit the evidence, and this

-15-

Court affirmed that ruling. This Court's decision was based, in part, on the lack of reliability inherent in polygraph tests. The decision, however, was also partially based on the fact that the machine cannot be cross-examined and that the polygraph examination had taken place approximately five and one-half months after the crime was committed. In State v. Campbell (1978), 176 Mont. 525, 579 P.2d 1231, 1234, 35 St.Rep. 733, 737, this Court stated:

> "The Montana rule is that the results of polygraph examinations are not admissible as evidence in a criminal trial. State v. Hollywood [citation]; State v. Cor (1964), 144 Mont. 323, 396 P.2d 86."

In the present case defendant argues that Hollywood and Campbell are based upon the lack of reliability of polygraph tests at the time those decisions were written. The time has now come, defendant asserts, when the courts must recognize that polygraph examinations have reached the level of accuracy where they should be admitted as evidence.

In defense of this assertion, defendant has presented several scholarly articles on the subject. The most persuasive of these authorities is a 1977 treatise entitled "Truth and Deception 2nd Edition" (Williams and Wilkins Company, 1977). In this treatise the authors reverse their long-standing opposition to the introduction of polygraph results into evidence and state that such evidence should now be allowed subject to certain conditions. For a full discussion of the scientific respectability of polygraph results, see State v. Stanislawski (1974), 62 Wis.2d 730, 216 N.W.2d 8.

As noted in the Stanislawski case, several jurisdictions have allowed polygraph results into evidence under varying circumstances. Two cases are representative of the

circumstances under which courts have allowed this type of evidence. In United States v. Ridling (D.C. Mich. 1972), 350 F.Supp. 90, which involved a perjury charge, the court said, ". . . polygraph evidence would be a valuable aid in connection with determining the kinds of issues involved in this case . . .", i.e., was the defendant telling the truth when he made the statements that were alleged to be the basis of the perjury charge? "A perjury case is based on 'willfully' or 'knowingly' giving false evidence. The experts all agree that the polygraph examination is aimed exactly at this aspect of truth." 350 F.Supp. at 93. As a result, the court allowed polygraph evidence to be introduced into evidence. In State v. Dorsey (Ct. App. 1975), 87 N.M. 323, 532 P.2d 912, aff'd, State v. Dorsey (1975), 88 N.M. 184, 539 P.2d 204, the trial court had refused to allow into evidence the results of the defendant's polygraph examination. The results tended to bolster the defendant's story that the victim had provoked the fight and that the defendant had killed the victim in self-defense. The New Mexico Court of Appeals reversed, saying that the results were admissible under a due process rationale. The court in Dorsey said that the examination results were admissible because they were reliable and critical to the defendant's case. "[T]he defense case came down to the credibility of defendant." The Dorsey decision was followed in State v. Shaw (Ct. App. 1977), 90 N.M. 540, 565 P.2d 1057.

In the present case the District Court refused the polygraph evidence as a matter of law. Apparently the judge had the mistaken belief that the examination was of the defendant rather than of the witness Schaeffer. Regardless of this mistake, however, we decline to overrule Hollywood

and Campbell. We also decline to follow the rationale expressed by the New Mexico court in Dorsey.

We believe that the better rationale is expressed in United States v. Alexander (8th Cir. 1975), 526 F.2d 161. Alexander contains an in depth discussion of the science of polygraph and why the results should not be allowed into evidence, viz., the scientific unreliability of the process. The Eighth Circuit Court, however, went on to point out an even larger problem in allowing such evidence before the jury. It said:

> ". . . in many cases where polygraph evidence is admitted, a single person, the polygraphist, will give testimony which will often be the determinative factor as to the guilt or innocence of a defendant in a jury-tried case. This would deprive the defendant of the common sense and collective judgment of his peers, derived after weighing facts and considering the credibility of witnesses, which has been the hallmark of the jury tradition." 525 F.2d at 168.

The court noted that other forms of scientific evidence may be allowed into evidence under Federal Evidence Rule 702 which is identical to Rule 702, Mont.R.Evid. Both rules state:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

The court in Alexander noted, however, that there is a profound difference between polygraph results and most other types of scientific evidence which are admissible, such as fingerprint comparisons or handwriting analysis. These types of scientific evidence are

> ". . . elicited solely for the purpose of identifying either an individual or an object allegedly involved in the perpetration of a criminal act. These scientific tests do not

purport to indicate with any degree of conclu-
siveness that the defendant who is so identi-
fied or connected with the object actually
committed the crime.  The jury, after receiving
such expert testimony, has the additional re-
sponsibility of reviewing other facts which
tend to prove or disprove defendant's connec-
tion with the crime and, if participation is
shown, the jury may further be required to as-
certain the defendant's mental state at the time
of the crime in appropriate cases.

"The role of the jury after a polygraphist has
testified that the results of a polygraph exam-
ination show that the defendant's denial of
participation in the crime was fabricated is
much more circumscribed.  If the expert testimony
is believed by the jury, a guilty verdict is usu-
ally mandated.  The polygraphist's testimony
often is not limited to mere identification or
any other limited aspect of defendant's possible
participation in the criminal act.  Through the
testimony of the polygraph expert relating to
whether the defendant was being truthful in his
responses concerning participation in the crime,
the expert is thus proffering his opinion based
on scientific evidence bearing upon the sole
issue reserved for the jury--is the defendant
innocent or guilty?"  526 F.2d at 169.

The same rationale applies to Schaeffer's polygraph

results.  Rule 702 allows expert opinion to be introduced at

trial if specialized knowledge will assist the trier of fact

to understand the evidence or to determine a fact in issue.

Defendant contends that Schaeffer's polygraph results will

help establish a defense of self-defense.  We disagree.

The only thing that Schaeffer's polygraph results can

accomplish in this regard is to establish Schaeffer's under-

standing of the defendant's motives.  This is not a fact in

issue in this case.  Schaeffer's credibility in understand-

ing the defendant's motive is not the type of evidence which

needs to be explained by an expert witness.

The only facts in issue here were defendant's acts and

intentions on the night Hurley was killed.  The opinion of

the polygraph operator does not fall within the scope of

Rule 702 because this expert would not be assisting the jury

-19-

to understand a fact in issue. Schaeffer was allowed to testify fully at trial to every item that he testified to during the polygraph examination. The jury was able to determine for themselves whether this testimony was credible. The polygraph expert in this case would be directly invading the province of the jury if he had been allowed to offer his opinion as to whether Schaeffer had been telling the truth. Schaeffer's credibility was not a fact in issue. It is distinctly the jury's province to determine when a witness is being truthful or untruthful. For these reasons it was not error for the District Court to grant the State's motion and rule as a matter of law that the evidence was inadmissible.

Defendant next argues that his conviction must be reversed because of certain statements that the special prosecutor made in his closing argument to the jury. The gist of these statements was to discredit defendant's claims that he acted in self-defense and that Hurley was the aggressor. The language used by the special prosecutor in the closing argument was as follows:

> "Bill Schaeffer thought they were just going there to beat him up a little. And you can tell by the way he sat on the stand and testified that it wouldn't take him long to completely annihilate more than two or three people. So he knew they were going over there for a fight. That's why he came into town. But he didn't know the defendant was going to shoot Hurley. He never had any idea about that. But he was out in front of the Blazer, and he was jumping and hollering around like a wild maniac with his Kung Fu. While he was out there the dome light of the Blazer came on. (Counsel taking exhibit gun in hand.) The defendant reaches down into the console, withdraws his weapon out of the holster—because this is the time—this is the time he has finally chosen after all of these months of trailing, surveilling, calling— this is the time. And he cocks it, (Counsel cocking gun) and he looks in there to make

> sure there's a shell. That's why the dome
> light is on. That's why Bill Schaeffer never
> saw the gun. And he shoots. (Counsel pulling
> trigger.) He shot James Hurley before Hurley
> ever even got a chance to grab him."

Defendant notes that these statements are contrary to Schaeffer's answers during the polygraph examination. Because the State was aware of the polygraph results, defendant argues, the State should not be allowed to present a version of the facts that is contrary to those results. In other words, the prosecution should not take unfair advantage of the District Court's exclusionary rulings.

Section 46-16-401(6), MCA, allows an attorney to comment upon the evidence of the case. An attorney may argue and draw reasonable inferences from evidence so long as there are facts to support such statements. State v. Moore (1975), 112 Ariz. 271, 540 P.2d 1252, 1256. The State, in the present case, presented evidence to support the prosecution's version of the homicide. There was evidence that defendant knew Hurley was in the bar, that defendant and Schaeffer attracted Hurley's attention outside of the bar, that Schaeffer had been standing outside defendant's vehicle prior to the time Hurley approached defendant, and of the defendant's prior relationship with Marian Irgens and Hurley. Given this evidence, the closing remarks did not exceed the bounds of comment and reasonable inference which may be made upon the evidence by an attorney.

Once again we note that the defense was allowed to put on their evidence. In particular Schaeffer was allowed to testify at trial as to every fact which was asked about during the polygraph examination. Defense counsel was allowed to comment on this evidence and put forward, to the jury, defendant's version of the circumstances surrounding

-21-

Hurley's death. The State did not violate any constitutional or statutory provisions by making the closing argument quoted above.

Defendant next contends that the trial court erred in admitting into evidence acts and statements of the defendant which occurred prior to the shooting. This evidence, which was introduced by the State, was to the effect that defendant and Marian Irgens had had a romantic relationship and that this relationship had subsequently deteriorated. This resulted, according to the State's testimony, in ill-feelings on the defendant's part toward Marian Irgens and James Hurley, when these two began seeing each other socially. This testimony indicated that defendant was keeping Marian Irgens and Hurley under surveillance, that defendant made phone calls to Irgens and to the Hurley household, and that defendant made threatening statements to and about Irgens.

Defendant made a motion in limine to exclude any threats that related to persons other than James Hurley. The trial judge ruled that the threats made directly to Marian Irgens were not to be mentioned but that statements made about her to other people were admissible.

Defendant points to three instances of testimony in this regard. (1) Marian Irgens was allowed to testify as follows:

"Q. The defendant said to you, 'When you have a problem you eliminate it?' A. Right.

"Q. And you felt that you were his problem? A. I felt that, yes, at the time."

(2) Irgens was allowed to testify that "He [the defendant] said he was going to ruin my name in Toole County . . ." This testimony was admitted in evidence despite the fact

that the trial judge had specifically ruled that Marian Irgens could not testify as to this fact.

(3) Deidra Merritt was called to the stand and testified that the following conversation took place on August 20, 1977:

> "Q. . . . Who came in? A. Ozzie Bashor. He came in and sat down next to me and bought a drink. . . Then he proceeded to say, 'You know, I caught Marian and Jim Hurley in bed last night at five o'clock in the morning.' Then he said, 'She's too goddam old a girl to be screwing around until five o'clock in the morning with some young guy like Jim.' I said, 'Well, under the circumstances, you and Marian aren't married and so you have no control of the situation and she can do anything she pleases.' He said, 'Well, she's nothing but a goddam whore. I'm going to make her pay for this.' I said, 'How are you going to do that?' and he said, 'I don't know, but I'm going to make her pay, and I'm going to hurt her as bad as she's hurt me, and she's nothing but a fucking whore.' . . ."

Rule 402, Mont.R.Evid., states in part that relevant evidence is admissible, while irrelevant evidence is not. Rule 401, Mont.R.Evid., defines relevant evidence as ". . . evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In the instant case the State had to prove that defendant purposely or knowingly caused the death of James Hurley. Section 45-5-102(1)(a), MCA. Consequently, evidence of the defendant's intent in this case is relevant.

In State v. Fine (1931), 90 Mont. 311, 2 P.2d 1016, this Court said:

> "The jury was entitled to know the relations of the parties,--to be given information of the conditions which led up to the homicide. The defendant alleged that he shot in self-defense. It was permissible for the state to show, if it could, that he had another motive than self-protection. . . It is familiar law that the emotion of jealousy may lead to a desire to

-23-

kill. . . The motive to kill may spring as
certainly from a fixed intention to possess
the object of one's affections, as from a fear
of loss of that already possessed." 90 Mont.
at 314, 2 P.2d at 1017.

Similarly, in the instant case the defendant alleged

that he shot in self-defense. The relationship between the

defendant and Marian Irgens was relevant to show intent.

Consequently, it was admissible.

Defendant further argues that the threats made against

Marian Irgens were irrelevant because they were not directed

at Hurley, the victim. As a general rule, threats against

persons other than the victim are not admissible. "However,

where the circumstances are such that the threat, although

made to a third person, tends to show hostility toward the

deceased, it is relevant. Thus, it may be shown that the

accused made a threat to a woman with whom both the accused

and the deceased were intimate. . ." 1 Wharton's Criminal

Evidence §204 (13th Ed. 1972).

> "Evidence of other crimes, wrongs, or acts is
> not admissible to prove the character of a per-
> son in order to show that he acted in conformity
> therewith. It may, however, be admissible for
> other purposes, such as proof of motive . . .
> [or] intent . . ." Rule 404(b), Mont.R.Evid.

In State v. Eaton (Me. 1973), 309 A.2d 334, the Maine

court said:

> "Previous threats made and assaults committed by
> the defendant are admissible in evidence where
> there is a close logical connection with the
> crime charged in the indictment such as shedding
> light upon the motive or intent of the defendant
> or where such evidence forms part of a single
> chain of facts so intimately connected that the
> whole must be considered in order to interpret
> its several parts." 309 A.2d at 338-39.

The same observations apply in the present case. The

threats made to Marian Irgens indicate that defendant was

very upset about the relationship between Hurley and Irgens.

-24-

This bears on defendant's intent or motive for the shooting. As such, it is relevant and admissible.

Defendant contends that even if this evidence was relevant, it should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice. Rule 403, Mont.R.Evid. We disagree.

The State was required to prove intent. It was important, therefore, to show that defendant had harbored strong feelings of resentment against Marian Irgens and Hurley and that this feeling manifested itself in a pattern of harassment, threatening statements and belligerent actions. This showing was especially necessary to counter defendant's contention that he was the victim of an unprovoked attack. Thus, the challenged testimony was crucial to prove defendant's mental state at the time of the shooting, and as a result, the probative value outweighed its prejudicial effect.

Defendant next contends that the trial court failed to fairly and fully instruct the jury on the law of self-defense. Under this specification of error defendant directs our attention to several of his proposed instructions which the trial court refused to give. Defendant also directs our attention to several of the State's proposed instructions concerning the law of self-defense which the trial court did give to the jury. These will be considered separately.

Defendant's Proposed Instruction No. 15 states:

"You are instructed that 'serious bodily injury' means bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss or impairment of the function or process of any bodily member or organ."

-25-

This proposed instruction is taken from section 45-2-101(53), MCA. The State objected to this instruction as follows:

> "We object to Defendant's Proposed No. 15. This is not a proper instruction for a self-defense case. It is not applicable to the definition of serious bodily injury. It is meant for the statute on aggravated assault. The entire definitions in the justifiable use of force section of the code and all through the comment refer to serious bodily harm and not serious bodily injury or death and serious bodily harm. This isn't a proper instruction."

The trial court refused the instruction.

The jury was given an instruction which was virtually identical to Montana's statute on self-defense. Section 45-3-102, MCA. This statute says, in part, that a person may use deadly force to protect himself to prevent ". . . serious bodily harm to himself . . ." The term "serious bodily harm" is not defined in Montana's Criminal Code.

During trial the defense introduced testimony which showed that the defendant had had a recent eye operation and that a blow to the head could cause the loss of vision in that eye. According to defendant, the refusal to give the definition of "serious bodily injury" as an instruction denied him the ability to fully present his self-defense theory to the jury.

In State v. Freeman (1979), ___ Mont. ___, 599 P.2d 368, 36 St.Rep. 1622, the defendant had pleaded self-defense and the trial court gave both the statutory definition of self-defense and "serious bodily injury." This Court held that the jury had been adequately instructed on this point. This Court, however, did not hold in _Freeman_ that the "serious bodily injury" definition had to be given to the jury. Rather, the test is whether "'. . . the instructions given on justifiable force gave the defendant ample opportunity to

expound to the jury in argument his theory with respect to the use of force as self-defense against an unlawful act.'" Freeman, 599 P.2d at 373, 36 St.Rep. at 1628.

In the present case defendant was able to present his evidence to the jury concerning the condition of his eye. He was permitted to argue that Hurley's actions threatened serious bodily harm. The jury was free to consider whether the fear of the loss of an eye could be considered as serious bodily harm. In short, defendant had ample opportunity to present to the jury his theory of self-defense. The refusal by the trial court to give Proposed Instruction No. 15 did not prevent defendant from fully presenting his case. Consequently, this refusal did not constitute error.

After the trial court refused the Proposed Instruction No. 15, defendant offered Proposed Instruction No. 15-A, which substituted the word "harm" for "injury" in Proposed Instruction No. 15. The State objected to this instruction, as follows:

> "No. We would have the same objection, Your Honor. The entire code is phrased in terms of serious bodily harm, and the comments very clearly say specifically whether or not something is serious bodily harm is a question for the jury, and this would be a comment on the evidence by defining what is or is not serious bodily harm."

The instruction was correctly refused by the trial court. "Serious bodily harm" is not defined by statute and does not necessarily equate with the statutory definition of "serious bodily injury." There is no indication that the legislature intended to integrate the definition of "serious bodily injury" into the self-defense statute. "We must presume the legislature knew what it was doing and was cognizant of the statutes of Montana as then enacted." Dept. of Revenue v.

-27-

B.N. Inc. (1976), 169 Mont. 202, 211, 545 P.2d 1083, 1088. As a result, it was not error to refuse defendant's Proposed Instruction No. 15-A.

Defendant asserts that the trial court committed reversible error by refusing to give defendant's Proposed Instruction No. 17, which read:

> "You are instructed that 'forcible felony' means any felony which involves the use or threat of physical force or violence against any individual."

This proposed instruction was taken from section 45-2-101(16), MCA. The State objected to this instruction stating, "We will object to No. 17 because there is no evidence in this case of a felony of any kind, much less a forcible felony."

As noted above, the jury was given an instruction on self-defense which was taken from section 45-3-102, MCA. The statute and the instruction use the term "forcible felony."

In Freeman, supra, the definition of "forcible felony" was given, but, once again, this Court did not hold that a District Court must give a definition of every term included in an applicable statute. By necessity, each case must be considered on its own facts as to whether the jury has been adequately instructed on every theory having support in the evidence presented. When the definition of "forcible felony" is considered it is apparent that the trial court did not err in not including it in the instructions. The definition adds nothing to the term being defined. The lack of this instruction could not prevent the defendant from fully presenting his case to the jury.

Defendant claims error in refusing to give defendant's

Proposed Instruction Nos. 16 and 18. Defendant's Proposed

Instruction No. 16 read:

> "You are instructed that 'occupied structure'
> means any building, vehicle, or other place
> suited for human occupancy or night lodging of
> persons or for carrying on business whether or
> not a person is actually present. Each unit of
> a building consisting of two or more units
> separately secured or occupied is a separate
> occupied structure."

This proposed instruction was taken from section 45-2-101(34), MCA. Defendant's Proposed Instruction No. 18 basically consisted of the statutory explanation of the law of defense of an occupied structure. Section 45-3-103, MCA.

The trial court was correct in refusing these instructions. Defendant argues that it was error to refuse such instructions because the definition of "occupied structure" includes the word "vehicle." Defendant was sitting in a Chevrolet Blazer when he shot Hurley. There is no evidence presented that the vehicle was equipped for human occupancy or night lodging.

From a reading of the definition of "occupied structure" it is clear that a vehicle, such as defendant's, is not intended. The structure must be "suitable for human occupancy or night lodging of persons or for carrying on business . . ." A defendant is entitled to an instruction having support in the evidence presented. State v. Quinlan (1929), 84 Mont. 364, 372, 275 P. 750, 753. He is not entitled to an instruction having no support in the evidence.

Defendant next contends that the trial court erred in giving several instructions which defined self-defense. The instructions involved are Nos. 24, 26 and 28. Defendant argues that these instructions do not clearly express the proposition that a person has the right to defend himself

-29-

against what he reasonably believes to be a threat of death or serious bodily harm even though the danger is not real. Section 45-3-102, MCA, uses the term "reasonably believes."

The court's Instruction No. 24 reads:

"You are instructed that before the defendant can avail himself of the right of self-defense, it must appear to him, acting as a reasonable person, that at the time of the killing the danger was apparently so urgent and pressing that in order to save his own life, or to prevent his receiving serious bodily harm, the killing was absolutely necessary."

The court's Instruction No. 28 reads:

"In order to justify the use of force likely to cause death or serious bodily harm (often called deadly force), it must appear to the Defendant that the danger was so urgent that, in order to save his own life, or to save himself from serious bodily harm, the use of such deadly force was absolutely necessary. And it must further appear that the deceased was the assailant. A bare fear of the commission of the offense, to prevent which the Defendant used a deadly weapon, is not sufficient to justify it; but the circumstances must be sufficient to excite the fears of a reasonable man, and the Defendant must have acted under the influence of such fears alone. It is not necessary, however, to justify the use of a deadly weapon that the danger be actual. It is enough to be an apparent danger; such an appearance as would induce a reasonable person to believe he was in danger of serious bodily harm. Upon such appearance a party may act with safety, nor will he be held accountable though it would afterward appear that the indications upon which he acted were wholly fallacious, and that he was in no actual peril. The rule in such case is this:

"What would a reasonable person--a person of ordinary caution, judgment and observation-- in the position of the Defendant, seeing what he saw, knowing what he knew, suppose from this situation and these surroundings? If such reasonable person so placed would have been justified in believing himself in imminent danger, then the Defendant would be justified in believing himself in such peril and acting upon such appearances."

Defendant's objection to both of these instructions was to the effect that they were incorrect statements of the

-30-

law. A review of these two instructions indicates that it was made absolutely clear to the jury that the danger need not be actual, it need only be what a reasonable person would perceive as being a threat to the person's life or a threat of serious bodily harm. The instructions were correctly given.

Instruction No. 26, which was given to the jury, reads:

"You are instructed that if you believe from the evidence that the defendant killed the deceased in necessary self-defense as explained and defined in these instructions, you must acquit the defendant."

Conceivably, the words "necessary self-defense" could be an incorrect statement of the law. However, in this case the instruction contains the proviso "as explained and defined in these instructions." As noted above, self-defense was correctly explained and defined in the other instructions; therefore, in this context, there was no error committed by giving Instruction Nos. 24, 26, and 28.

Next, defendant contends that it was error to give Instruction No. 27, which stated:

"You are instructed that an aggressor is one who provokes an attack upon himself, brings on or encourages a difficulty or quarrel. An aggressor cannot assert that he acted in self-defense."

Defendant contended at trial and contends on appeal that there was no evidence presented in support of this instruction and that the law as given was an incorrect statement of the law.

The trial judge must instruct the jury on every essential question presented by the evidence. State v. Quinlan, supra, 84 Mont. at 372, 275 P.2d at 753. In the present case there was some evidence to support the instruction

given which defined "aggressor." There was testimony that defendant had left the headlights on as he sat in his vehicle in the parking lot, thereby attracting Hurley's attention. There was testimony that Schaeffer was outside defendant's vehicle hollering at Hurley and his companions. There was also the testimony, discussed above, as to defendant's prior acts of hostility towards Hurley and Marian Irgens. Given this testimony, there was sufficient evidence to justify the aggressor instruction.

Defendant also contends that this instruction was an incorrect statement of the law. He bases this contention upon the fact that there are some exceptions to the aggressor limitation. Section 45-3-105, MCA, states that an aggressor may use the theory of self-defense if (1) he has exhausted every reasonable means of escape, or (2) if he withdraws from physical contact with the assailant and clearly indicates that he desires to terminate the use of force. These exceptions are inapplicable under the evidence in this case.

In addition, the State offered an instruction which incorporated the statutory language of section 45-3-105, MCA. The defense objected to this instruction on the ground that there was no evidence that defendant provoked an attack. The State then withdrew the instruction. Defendant did not offer an instruction which dealt with the same subject. He now contends such an instruction should have been given. In State v. Romero (1965), 146 Mont. 77, 83, 404 P.2d 500, 503, this Court considered a similar situation and said:

> "Had the defendant felt the court improperly in-
> structed the jury on all aspects of the case, it
> was his duty to submit instructions which more
> fully covered the particular matter which he was
> dissatisfied with, and in failing to do so he
> cannot now allege prejudicial error."

Having objected to the very instruction he now asserts should have been included, defendant may not now predicate error on the absence of the qualifying instruction.

Defendant contends that the trial court erred in failing to instruct the jury on mitigated deliberate homicide and negligent homicide. This Court has recently stated the general rule that "an instruction is required where there is some evidence to support the lesser [included] offense." State v. Hamilton (1980), ___ Mont. ___, 605 P.2d 1121, 37 St.Rep. 70, 77. This Court also said in Hamilton that negligent homicide (section 45-5-104, MCA) was to be considered a lesser included offense of deliberate homicide (section 45-5-102, MCA). The same reasoning can be applied to mitigated deliberate homicide (section 45-5-103, MCA), because the two crimes consist of the same elements, the only difference being the presence of "extreme mental or emotional stress" in the lesser crime.

We need not, in this case, determine whether there is evidence to support the lesser included offense. The State offered an instruction on mitigated deliberate homicide. Defense counsel objected to this instruction "for the reason that the evidence shows the defendant was either guilty of deliberate homicide or not guilty." The instruction was then withdrawn.

This Court has held that error may not be predicated upon the failure to give an instruction when the instruction was not offered. State v. Harvey (1979), ___ Mont. ___, 603 P.2d 661, 36 St.Rep. 2035, 2038. Failure to offer an instruction removes the cause of error, particularly when the defense counsel has objected to the instruction upon the

ground that the defendant was either guilty of deliberate homicide or not guilty.

Affirmed.

_Frank I. Haswell_
Chief Justice

We concur:

_Gene B. Daly_

_John Conway Harrison_
Justices

Mr. Justice Daniel J. Shea and Mr. Justice John C. Sheehy dissent and will file a written dissent later.

IN THE SUPREME COURT OF THE STATE OF MONTANA

---

D I S S E N T

---

No. 14542

STATE V. BASHOR



FILED

JUL 17 1980

*Thomas J. Kearney*

CLERK OF SUPREME COURT
STATE OF MONTANA

--------------------------------------------------------------

Mr. Justice John C. Sheehy, and Mr. Justice Daniel J. Shea

DATED July 17, 1980

--------------------------------------------------------------

Mr. Justice John C. Sheehy dissenting:

I think the motion to change the place of trial in this case should have been granted. The newspaper article using unfounded facts to portray the incident as an old west shoot-out together with the news broadcast over radio station KSEN created a climate of opinion in the county which is evidenced by the several calls received by the Toole County Sheriff's Office to determine whether the defendant had been released from jail on bond, and making known the callers' objections if the defendant was to be released. The justice of the peace who set the bail bond at $50,000 received thereafter an anonymous telephone call indicating that the defendant would be shot if he were released. The situation was bad enough that when the defendant was released on bond, the judge made it a condition of his release that he leave Glacier and Toole Counties, except for court appearances, for his own protection. The caretaker who managed the Bashor property in Bashor's absence was then threatened and intimidated.

The antagonistic attitude of the community was demonstrated in the voir dire examination of the juror to which reference is made in the majority opinion.

Our courts are understandably cautious about the added costs of trials in places other than the county where the alleged crime occurred. However, the constitutional requirement of fair trial, Art. II, §17, 1972 Mont. Const., overrides financial considerations. See State v. Spotted Hawk (1899), 22 Mont. 33, 55 P.2d 1026; State v. Dryman (1954), 127 Mont. 579, 269 P.2d 796.

As a second point, the instructions offered by the State, given by the District Court, and now approved by this

Court make it impossible for a defendant to establish self-defense in this state.

Court's instruction no. 24, tells the jury that before a defendant can avail himself of the defense of self-defense, it must appear to him as a reasonable person that "the danger was apparently so urgent and pressing" that "the killing was absolutely necessary."

In court's instruction no. 28, the jury is told that in order to justify the use of force, it must appear to the defendant that the danger was so urgent that in order to save his own life or to save himself from serious bodily harm, the use of such deadly force was "absolutely necessary." This instruction obliterated the "reasonable man" test.

In instruction no. 26, the jury was told that defendant could be acquitted if he killed the deceased "in necessary self-defense."

The use of the terms "necessary", "absolutely necessary", and "urgent and pressing" require nearly impossible tests for self-defense. The approval of those terms by this Court will bring us a log-jam of cases in the future to straighten out the law.  The instructions go far beyond section 45-3-102, MCA, on which model Instruction no. 35, Criminal Instructions--Montana, is based:

> "You are instructed that a person is justified
> in the use of force or threat to use force
> when and to the extent that he reasonably
> believes that such conduct is necessary to
> defend himself against the imminent use of
> such force.

> "However, a person is justified in the use of
> force which is intended or likely to cause
> death or serious bodily harm only if he really
> believes that such force is necessary to prevent
> imminent death or serious bodily harm to himself
> or the commission of a forcible felony."

We should not give judicial sanction to the misstatements of law contained in those three instructions which were properly objected to.

Thirdly, the final argument of the prosecutor to the jury went beyond the bounds of propriety, because he used inflammatory material which he knew to be untrue in that argument. The prosecutor stated:

> "Bill Schaeffer thought they were just going there to beat him up a little. And you can tell by the way he sat on the stand and testified that it wouldn't take him long to completely annihilate more than two or three people. So he knew they were going over there for a fight. That's why he came into town . . ."

The prosecutor knew from the polygraph examination of Bill Schaeffer that statements that they went to the bar looking for a fight were not true. Otherwise the State would have had to prosecute Bill Schaeffer as an accomplice. The "bounds of comment and reasonable inference" relied upon by the majority do not include untruth. To make matters worse, the State, though making statements in final argument which are not in accordance with the polygraph examination of Bill Schaeffer, nevertheless argued to keep out the polygraph examination which would have shown those prosecutor statements to be false.

One detects a reluctance on the part of the courts involved in this case to face up to an irate community aroused because of the killing of a popular citizen by an unpopular citizen. It is for that kind of criminal that the law sets up con-stitutional and legal safeguards to insure a fair trial for every defendant, no matter how guilty eventually he may turn out to be.

I would reverse for a new trial in a different county.

---------------------------------

Mr. Justice Daniel J. Shea concurring in the foregoing dissent:

I agree with Justice Sheehy that the trial court should have granted a change of venue and I would reverse this case with the proviso that the cause be tried in another county.

While I do not feel that the self-defense instructions submitted by the State and adopted by the court, were erroneous when taken as a whole, they were not model instructions by any means and I would not recommend that they be used again. The State is engaging in the practice of ~~guilding~~ the lilly and this can only lead to unfortunate reversals if the practice is continued.

I believe, furthermore, that the polygraph examination results should have been admitted in evidence, and that it was reversible error not to do so. It is unfair to the extreme for the State to insist on a polygraph examination, and after the defendant has taken one, to resist its admission in evidence. For whatever the polygraph results would have had to the jury, they should have been admitted. I note in this regard that the time has come when the courts should not be so rigid in their steadfast resistance to the use of polygraph examination results. With proper restraints, polygraph test results can be a valuable aid in the fact-finding process.

_____
Justice
