No. 14503

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

_____

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

MICHAEL SCOTT FREEMAN,

Defendant and Appellant.

_____

Appeal from:  District Court of the Thirteenth Judicial District,
Honorable Robert H. Wilson, Judge presiding.

Counsel of Record:

For Appellant:

John L. Adams argued, Billings, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Richard Larson, Assistant Attorney General, argued, Helena, Montana
Harold F.Hanser, County Attorney, Billings, Montana

_____

Submitted:  June 5, 1979

Decided: SEP 11 1979

Filed:

_____
Thomas J. Kearney
                      Clerk

Mr. Justice John C. Sheehy delivered the opinion of the Court.

This is an appeal by defendant, Michael Scott Freeman, from a judgment of conviction of mitigated deliberate homicide entered in the District Court, Thirteenth Judicial District, Yellowstone County. Defendant was sentenced to ten years inprisonment, with three years suspended.

Early in the morning of September 11, 1977, Kirk Nelson and two companions drove in an automobile to the home of Michael Scott Freeman. Nelson had a "bone to pick" with Freeman in that earlier that evening Nelson had been arguing with a man named Larry Foster who imputed to Freeman statements that Freeman had made to Foster concerning Nelson.

Nelson arrived at Freeman's home at approximately 2:00 a.m. He walked up to the house alone and knocked on the door. Freeman awakened, answered the door, and Nelson entered the house. Shortly thereafter, the two men who had been waiting in Nelson's car also entered the house. Freeman testified at trial that Nelson threatened him repeatedly, but the two companions testified that no threats were made in their presence in the house.

At Nelson's request, the two companions left in Nelson's car. They returned a short time later and found the house empty and Freeman's car gone.

Freeman testified that Nelson ordered him to get dressed and accompany him to Raymond Best's house for a meeting with Foster. Freeman claims that Nelson repeatedly threatened to pistol-whip Freeman with the handgun he was carrying. However, at no time did Nelson take the gun out of his jacket.

Freeman drove his car to Best's house with Nelson riding in the front passenger seat. He parked the car directly in front of the house and Nelson got out and started to walk toward the gate. Freeman got out of his car slowly, which enabled him to grab a gun he kept hidden under the passenger seat. As Freeman stepped out, he aimed the gun over the hood of the car and shot Nelson in the hip. Freeman fired three more shots in rapid succession as Nelson moved away. Nelson did not fire his weapon.

At 2:40 a.m., Freeman walked into the Billings Police Station and told the authorities that he had just shot Nelson. He explained what had happened and was taken into custody. The police searched for Nelson but did not find him. At approximately 6:30 a.m. that morning, David Ramirez discovered Nelson's body on the front porch of the Ramirez house, which is located in the same neighborhood as the Best house. A loaded .357 caliber pistol was found on the body, and several .357 caliber shells. Also, a set of brass knuckles, a razor blade, paint scraper, and a small quantity of marijuana were found in Nelson's pockets.

The subsequent autopsy established that Nelson bled to death from the bullet wound in his left hip.

On September 12, 1977, Freeman was charged with the crime of deliberate homicide. A trial date of November 17, 1977 was set. However, on November 14, 1977, the Yellowstone County Attorney filed an amended information which included further charges against Freeman of conspiracy to commit homicide and aggravated burglary of Nelson's home. Larry Foster was also charged with these crimes in the amended information.

Freeman gave notice of his intent to rely on self-defense on November 16, 1977. Freeman and Foster were arraigned on November 21, 1977. Both men entered pleas of not guilty.

-3-

On December 5, 1977, Freeman himself filed on his own behalf a "demand for speedy trial or motion to dismiss for lack of evidence" and a further "motion to withdraw court-appointed counsel."

A trial date of April 4, 1978, was set for Freeman and Foster, who were to be tried jointly. Prior to trial on February 15, 1978, the District Court heard arguments on Freeman's motions and determined (1) a truth serum test Freeman had requested would be permitted, but the results would be inadmissible as evidence; (2) a special investigator for the defense would be permitted; and (3) a motion for severance of trials would be continued at Freeman's counsel's request.

On March 14, 1978, Freeman moved for acquittal due to the lack of speedy trial.

On April 4, 1978, at the final pretrial conference, the District Court denied defendant's motions for acquittal for lack of speedy trial and granted his motion for severance of trials. Trial of the charges against Freeman began immediately thereafter.

The jury found Freeman guilty of mitigated deliberate homicide on April 11, 1978. The conspiracy charge had previously been dismissed by the court at the close of the prosecutor's case. On April 21, 1978, Freeman was sentenced to ten years in prison, with three years suspended and credit for time served.

Larry Foster ultimately entered a plea of guilty to the charge of aggravated burglary of Nelson's home. The remaining charges against him were dismissed on the County Attorney's motion.

Freeman timely appealed the judgment of conviction against him and the matter is now before us for decision.

-4-

Freeman's appeal gives us these issues to consider:

(1)  Was Freeman denied a speedy trial?

(2)  Was the jury inadequately instructed on the defense of self-defense?

(3)  Is there a statutory conflict between the defense of self-defense and the crime of mitigated deliberate homicide?

(4)  Did the prosecution's presentation of evidence concerning the alleged conspiracy so cloud the jury's mind that Freeman was denied a fair and impartial trial?

A speedy trial is a federal and state constitutional right.  U.S.Const. Amend. VI; 1972 Mont. Const., Art. II, §24. When a speedy trial inquiry is triggered, we examine the issue under the balancing test suggested in Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101. The factors in Barker "have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process" to determine whether a speedy trial has been denied. 407 U.S. at 533.

We have followed the Barker test in State v. Tiedemann (1978), ____ Mont. ____, 584 P.2d 1284, 35 St.Rep. 1705; and State v. Collins (1978), ____ Mont. ____, 582 P.2d 1179, 35 St.Rep. 993.  We held that the balancing test was required after a delay of twelve months in State v. Steward (1975), 168 Mont. 385, 543 P.2d 178; ten months in State ex rel. Sanford v. District Ct. Thirteenth J. D. (1976), 170 Mont. 196, 551 P.2d 1005; and seven months in Fitzpatrick v. Crist (1974), 165 Mont. 382, 528 P.2d 1322.  In Fitzpatrick, we held that a seven-month delay was long enough to shift to the State the burden of explaining the reason for the delay and showing the absence of prejudice.

If the date of Freeman's arrest is used as a starting point, the pretrial delay totals 207 days.  If the date the

-5-

amended information was filed, the time elapsed to the time of trial totals 142 days.

The time from Freeman's arrest until trial on the charges consumed approximately seven months. The State contends that the delay should be computed only from the time the amended information was filed. However, such computation of time would be insufficient. Freeman was arrested and placed in jail on September 11, 1977, and remained there until trial, seven months later. He was accused of a crime on the day he was arrested and his right to a speedy trial accrued as of that date. Therefore, the total delay in Freeman's case approximates the delay found in Fitzpatrick, supra, and so the balancing test of Barker must be considered here.

Once the burden has shifted to the State to explain the reason for the delay, the question becomes, to whom is the delay to be attributed? For the State, the question is whether the prosecution was pursued with reasonable diligence. State v. Carden (1977), ____ Mont. _____, 566 P.2d 780, 34 St.Rep. 420. Typically, the courts look for "dead time" in which nothing is done by the prosecution in defendant's case. On the other side of the coin, it must be determined what percentage of the delay is chargeable to the defendant and this amount of time must accordingly be deducted from the total delay.

The lapse of time from September 11, 1977 to November 14, 1977, when the amended information was filed is explained by the State in this way: Freeman's confession did not reveal the involvement of Larry Foster in the alleged crime. It was not until a subsequent investigation by the police revealed that Nelson's house had been burglarized the same night the shooting had occurred and that Larry Foster was a likely suspect, that the authorities considered the possibility of a conspiracy between Foster and Freeman to commit deliberate

-6-

homicide. The State had a viable case against Freeman when the original charges were filed. It was not a lack of evidence or inexcusable neglect that delayed the trial. Rather, it was the possibility of a considerably more complicated crime that prompted the State to investigate further and ultimately to file the amended information. Therefore, because the State pursued the prosecution with reasonable diligence, this lapse of time cannot be charged against the State.

After the amended information was filed on November 14, 1977, there were several motions presented by defendant, including a motion to withdraw court-appointed counsel that Freeman had earlier filed on December 5, 1977. These motions took up the time of the court and of the prosecution until the time of trial. The motions included a motion of intent to rely on self-defense, a motion for additional time to give notice valid by witnesses, a motion for severance, a motion to suppress the evidence, a motion for disclosure of investigative files, a motion for declaration of possible penalty, a motion for continuance and several others. True, some of these motions were filed by codefendant, Larry Foster, but they involved the same cause and required the court's consideration to rule on such time-consuming motions.

Therefore, because the State pursued the prosecution with reasonable diligence and because a large part of the delay was due to the filing and consideration of numerous defense motions, prejudice to Freeman caused by the state cannot be presumed.

It is true that Freeman effectively asserted his right to a speedy trial on March 14, 1978, by filing a motion for acquittal for denial of a speedy trial. There is no dispute on this point.

With respect to the fourth <u>Barker</u> factor, whether the delay prejudiced Freeman's case, it must be admitted that Freeman was incarcerated from the time of his arrest until the time of trial. Undoubtedly he experienced anxiety and concern as evidenced by his motions on his own behalf relating to his counsel and for a speedy trial. However, there is no showing by Freeman that he lost essential witnesses or that his right to a fair trial was impaired.

> "The fourth factor to be considered, the prejudice to the defendant, has no support in the record. Nothing has been brought to our attention that would show the delay hampered the defendant in any way in presenting his defense. Defendant claims the delay caused him concern and anxiety, but these are inherent in any criminal case. <u>Barker</u> <u>v.</u> <u>Wingo</u>, supra, . . .
>
> "We find therefore that defendant fails to meet the criteria necessary to show he had been denied a speedy trial by the state. State ex rel. Sanford v. District Court, supra; Barker v. Wingo, supra; State v. Steward (1975), 168 Mont. 385, 388, 543 P.2d 178, 181." State v. Collins (1978), _____ Mont. _____, 582 P.2d 1179, 1187, 35 St.Rep. 993, 1003.

On balance, it therefore appears the State was diligent in pursuing the prosecution of Freeman's case. Most of the delay is attributable to him and to his codefendant. No prejudice has been shown that would lead us to conclude Freeman has been denied due process by a lack of speedy trial.

With respect to whether the court adequately instructed the jury regarding Freeman's defense of self-defense, we have examined the instructions given and those offered and refused in light of those given, and find that the jury in this case was adequately instructed on that point.

The court gave the following instructions:

"Given Instruction No. 16:

"A person is justified in the use of force or threat to use force when and to the extent that he reasonably believes that such

-8-

conduct is necessary to defend himself
against the imminent use of unlawful force.

"However, a person is justified in the
use of force which is intended or likely
to cause death or serious bodily injury
only if he reasonably believes that such
force is necessary to prevent imminent
death or serious bodily harm to himself
or the commission of a forcible felony.

"Given Instruction No. 17:

"You are instructed that forcible felony
means any felony which involves the use
or threat of physical force or violence
against any individual, and includes the
crimes of kidnaping, assault, unlawful
restraint and intimidation.

"Given Instruction No. 18:

"'Force likely to cause death or serious
bodily harm' includes but is not limited
to the firing of a firearm in the direction
of a person, even though no purpose exists
to kill or inflict serious bodily harm.

"Given Instruction No. 19:

"A person is not guilty of an offense
by reason of conduct which he performs
under the compulsion of threat or menace
of the imminent infliction of death or
serious bodily harm, if he reasonably
believes that death or serious bodily
harm will be inflicted upon him if he
does not perform such conduct.

"Given Instruction No. 20:

"'Serious bodily injury' means bodily
injury which creates a substantial risk
of death or which causes serious permanent
disfigurement or protracted loss or impairment
of the function or process of any bodily
member or organ."

In State v. Collins, supra, 582 P.2d at pp. 1184, 1185,

this Court considered objections quite similar to those

raised here as to instructions in a self-defense case. In

Collins, as here, defendant had been charged with deliberate

homicide and the jury convicted him of mitigated deliberate

homicide. Defendant contended that he acted in self-defense

and that therefore, his actions were justified or exonerated

by the circumstances surrounding the death of the decedent.

-9-

In Collins, we looked to the law on justification or exoneration, and examined the instructions in the light of the applicable statutes establishing such defenses. In doing likewise here, we find that section 45-3-102, MCA, provides:

"Use of force in defense of person. A person is justified in the use of force or threat to use force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force likely to cause death or serious bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to himself or another or to prevent the commission of a forcible felony."

When court instructions nos. 16 through 20, as we have set forth above, are examined in light of section 45-3-102, MCA, it is apparent that the court fairly and fully instructed the jury on the law relating to justification or exoneration for criminal conduct. As we said in Collins, 582 P.2d at pp. 1184, 1185:

". . . Using the test applied in State v. Porter (1964), 143 Mont. 528, 539, 391 P.2d 704, the instructions given on justifiable force gave the defendant ample opportunity to expound to the jury in argument his theory with respect to the use of force as self-defense against an unlawful act."

We will not set out in this opinion Freeman's offered instructions nos. 2, 10, and 18, refused by the court, which Freeman now contends were necessary in connection with his defense of justification or exoneration. It is enough to say that we have examined these instructions, and they would not have added substantially anything that was not already said by the court in its instructions on the same subject. Nothing appears to us, from the instructions given, to indicate that Freeman or his counsel, was prevented in final argument from presenting fully his contentions on self-defense, because the instructions given enabled him fully to

-10-

state the law to the jury as set forth in the court's instructions:

> "We have often held that it is not error for a trial court to refuse to give a requested instruction, or by implication a portion thereof, if the instruction's legal theory was adequately covered by the instructions that were given and as long as the rights of the defendant were fully protected. . ." State v. Lagge (1964), 143 Mont. 289, 295, 388 P.2d 792, 795.

Freeman also maintains that the court improperly refused his offered instruction no. 21, which would have instructed the jury that if the evidence of the case was susceptible to two constructions, one of which was consonant with guilt and the other consonant with innocent, it was the jury's duty to adopt the interpretation which was consonent with innocent. That instruction is generally given where the State relies on circumstantial or indirect evidence to prove its case. The instruction has no application where the evidence is direct with respect to the crime charged.

The next issue we consider is Freeman's contention that there is a statutory conflict between the definition of mitigated deliberate homicide and a defense of justification or exoneration.

Neither the State, nor counsel for Freeman, discussed this issue in brief or oral argument, but we presume that the conflict is the same as the defendant contended existed in State v. Collins, supra. Mitigated deliberate homicide is defined in section 45-5-103, MCA, as a homicide "which would otherwise be deliberate homicide [but] is committed under the influence of extreme mental or emotional stress for which there is a reasonable explanation or excuse. . ." That definition gave rise to a contention in Collins, supra, about which we said:

> "One other contention of this final issue is that the verdict of the jury is inconsistent with the evidence in that since the defendant

-11-

was convicted of mitigated deliberate homicide, the jury must have found defendant was acting under extreme mental or emotional stress brought about by the apparent intended attack upon his person and his property. Defendant contends the only possible mental or emotional stress for which there is a reasonable explanation or excuse suggested by the evidence is that defendant feared for himself in the circumstances described. Therefore, defendant argues, if the jury found such stress to exist, it could only be such stress as would permit self-defense. Then defendant returns to his former argument that since the court did not instruct the jury that it should acquit the defendant when self-defense was established, the verdict is inconsistent with the evidence.

"What this contention of defendant overlooks is that while under the facts of this case the jury could have found defendant was acting under mental or emotional stress brought about by the attack by Gardipee, the jury could also have found the counter-force used by the defendant was so excessive as not to be reasonable and justified. Section 94-3-102, R.C.M. 1947. The jury could have concluded that the force used in self-defense by defendant, the shooting, was not the action of a reasonable person under the circumstances. In that situation, a verdict of mitigated deliberate homicide is justified. It is not given to us, however, to look into the minds of the jurors to ascertain how they arrived at their verdict. When, as here, we find the jury was fairly instructed, we must leave the weighing of the evidence and determination of the facts to that jury. It is not within our province to set aside the verdict here." 35 St.Rep. at 1005, 582 P.2d at 1187-1188.

What we said in Collins, supra, adequately disposes of the contention that there is a statutory conflict between the defense of justification and the crime of mitigated deliberate homicide, where the jury finds in fact that mitigated deliberate homicide was committed.

Freeman's final contention is that the presenting of evidence concerning the alleged conspiracy between Freeman and Larry Foster so clouded the jury's mind that Freeman was denied a fair and impartial trial.

-12-

The charge of conspiracy to commit deliberate homicide was dismissed by the District Court at the close of the State's case. The District Court gave the following instruction to the jury:

"Given Instruction No. 3.

"You are instructed that the charge of conspiracy to commit deliberate homicide has by the court been dismissed, and is not to be considered by you. Evidence has been received in this Court pertaining to such alleged criminal conspiracy to commit deliberate homicide. You will disregard such evidence and any evidence pertaining to the charge of deliberate homicide as elsewhere in these instructions defined, and will draw no inferences nor make any surmises from any evidence offered other than the evidence which may pertain to the charge of deliberate homicide. You will consider only the evidence pertaining to the charge of deliberate homicide and the defense of self-defense, and will render your decision of innocence or guilt solely on such evidence."

"The 'general rule' is that where the trial judge withdraws improper testimony from the jury's consideration, such an instruction is presumed to cure any error which may have been committed by its introduction." Anderson v. State (Alaska, 1968), 438 P.2d 228, 233 n. 15. The Alaska Supreme Court cites a United States Supreme Court decision, Pennsylvania Co. v. Roy (1880), 102 U.S. 451, 459, 26 L.Ed. 141, 145. Although the high court decision involved a civil suit, the reasoning is applicable here:

". . . The charge from the court that the jury should not consider evidence which had been improperly admitted, was equivalent to striking it out of the case. The exception to its admission fell when the error was subsequently corrected by instructions too clear and positive to be misunderstood by the jury. The presumption should not be indulged that the jury were too ignorant to comprehend, or were too unmindful of their duty to respect, instructions as to matters peculiarly within the province of the court to determine. It should rather be, so far as this court is concerned, that the jury were influenced in their verdict only by legal evidence. Any other rule would make it necessary in every trial, where an error in the admission of proof

-13-

is committed, of which error the court becomes aware before the final submission of the case to the jury, to suspend the trial, discharge the jury, and commence anew. A rule of practice leading to such results cannot meet with approval."

In State v. Gander (1976), 220 Kan. 88, 551 P.2d 797, the jury considered two photographs and a line-up sheet that had not been admitted at trial. When the mistake was discovered the trial judge called the jury into the courtroom and instructed it to disregard the exhibits. The Supreme Court of Kansas said: "It is basic that an admonition to the jury normally cures any prejudice from the improper admission of evidence. (Citing cases.) This is not a case in which 'it cannot be said the jury was not prejudiced' (citing cases), and we thus hold that the instruction cured any error."

The judgment of conviction is affirmed.

```
                                   _____
                                             Justice
```

We Concur:

```
_____
       Chief Justice

_____


_____


_____
         Justices
```

-14-