No. 04-695

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 89

_____

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

RODNEY DUBOIS,

        Defendant and Appellant.

_____

APPEAL FROM:    District Court of the Eighth Judicial District,
                      In and for the County of Cascade, Cause No. BDC 2003-147
                      The Honorable Julie Macek, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Jeffrey L. Olson, Attorney at Law, Great Falls, Montana

        For Respondent:

                Hon. Mike McGrath, Attorney General; Tammy K. Plubell, Assistant
                Attorney General, Helena, Montana

                Brant S. Light, County Attorney; Susan Weber and Mary Ann Ries,,
                Deputy County Attorneys, Great Falls, Montana

_____

                Submitted on Briefs:  August 30, 2005

                          Decided:  April 25, 2006

Filed:

_____
                          Clerk

Justice John Warner delivered the Opinion of the Court.

¶1 Rodney Dubois (Dubois) appeals from his conviction of Deliberate Homicide in the Eighth Judicial District Court, Cascade County. He contests the fairness of his trial on multiple grounds. We affirm.

¶2 We address the following issues on appeal:

¶3 1. Did the District Court err in its jury instruction no. 12 concerning the requisite mental state for deliberate homicide?

¶4 2. Did the District Court err in failing to give a specific instruction on proximate cause?

¶5 3. Was Dubois' counsel ineffective in not offering an instruction on proximate cause?

¶6 4. Did the District Court err in denying Dubois' motion for a mistrial because the prosecutor, in cross-examining a defense witness, described him as a gangster?

¶7 5. Did the District Court err in not granting Dubois a mistrial because, in closing argument, the prosecutor used the word "lie" in referring to a statement by Dubois?

BACKGROUND

¶8 The events leading to this appeal occurred on March 15, 2003. Dubois chose to testify at his trial. According to Dubois, he went to the home of Dion Guckeen (Guckeen) with his friend Herman Belgarde (Belgarde) to procure methamphetamine. While Belgarde was in another room, Guckeen told Dubois that he was a paranoid schizophrenic and could get away with killing Dubois. Dubois went into the other room and related these statements to Belgarde. Belgarde told Dubois not to worry and gave

2

him a small baseball bat. When Dubois and Belgarde left the room, they found Guckeen holding a gun. Belgarde took the gun from Guckeen, removed all the bullets except one, and gave the gun back to Guckeen. Dubois left Guckeen's house and eventually got a ride back to his home from a local resident, to whom Dubois gave the bat.

¶9     Dubois said that Belgarde then called him, telling him to come back to Guckeen's house because methamphetamine was available there, and that he could safely return. Dubois said he tried to drive to Guckeen's house but got lost, and Belgarde sent friends to pick him up. Dubois took a large flashlight with him for defense. When Dubois arrived, there was no methamphetamine. Guckeen accused Dubois of sleeping with his girlfriend, which Dubois denied. Dubois then said that Guckeen pulled a gun from under a cushion he was sitting on. Dubois grabbed another baseball bat and left Guckeen's house with Belgarde, Linda Scott (Scott), and Misty Palmerton (Palmerton).

¶10    Dubois went on to say that, after dropping off Belgarde, he stayed with Scott and Palmerton, who promised they were going to go party. The three went back to Guckeen=s house, where Dubois felt a tense atmosphere. Guckeen kept looking at Dubois and then at the cushion where the gun had previously been. Guckeen then reached under that same cushion, and Dubois, thinking Guckeen was reaching for the gun he had seen earlier, hit him in the head with the baseball bat. Dubois did not think the first hit had done anything to Guckeen, so he hit Guckeen twice more in the head. Dubois thus claimed that he acted in self defense.

¶11    According to Dubois, another man in the room, Tony Sambenedetto (Sambenedetto), appeared to be reaching for another bat, and Dubois told him not to.

3

Sambenedetto then left. Dubois did not admit hitting Sambenedetto with the bat.

¶12 Dubois said Scott told him to call 911, which required him to leave the house. Palmerton went with Dubois, who took the bat. When they returned to the house, Palmerton suggested that they all lie to the police and say that they found Guckeen already injured, and she said she would tell Scott what to tell the police. Dubois initially lied to the police about what happened, saying that he found the bat and held it in safekeeping for the authorities. After Dubois learned that Palmerton and Scott had told the police what actually happened, he explained why he hit Guckeen with the bat.

¶13 The State's witnesses contradicted many parts of Dubois' story. According to Scott, she had been at the house earlier in the day when Guckeen, Dubois, Belgarde, and Sambenedetto were all present, and they appeared to be just sitting around talking. When Scott returned later with Palmerton, she heard neither arguing nor an exchange of bad words.

¶14 Palmerton said she saw Dubois hit Guckeen in the head with the bat, and she yelled at Dubois as he walked away. Dubois then turned and headed back toward Guckeen. Palmerton jumped in front of Dubois, but he threw her into the wall and hit Guckeen in the head again. Palmerton then saw Dubois approach Sambenedetto, who put his arms up for protection. Dubois swung the bat at Sambenedetto's arms and told him to leave. According to Palmerton, Dubois told her to lie and say they found the baseball bat in the driveway. However, after the police put Palmerton and Scott in a car away from Dubois, Palmerton explained how Dubois had attacked Guckeen.

¶15 Sambenedetto testified that Dubois hit him with the bat.

4

¶16    According to Palmerton, Scott, and Sambenedetto, Guckeen did not have a gun on March 15, 2003, and none of them heard Guckeen threaten Dubois or argue with him. A friend of Guckeen's, Tiffany Cook, also said Guckeen did not have a gun that day, and she had never seen a gun at Guckeen's house. No gun was found in the house.

¶17    Dr. Glenn Winslow (Dr. Winslow), a trauma surgeon, and Dr. Karen Fagin (Dr. Fagin), a neurosurgeon, treated Guckeen at Benefis Hospital. Guckeen was comatose and completely unresponsive. His breathing was alternately rapid and slow, which implied damage to the brain stem as well as to the brain itself. Guckeen exhibited limited brainstem function. Guckeen's treatment included intubation in order to force rapid breathing in an attempt to ease the pressure inside his head, as well as morphine to both ease pressure and alleviate pain. The amount of morphine administered to Guckeen was increased slowly during his time at the hospital.

¶18    Guckeen's family did not want extraordinary measures taken to keep him alive after being told he would likely never be aware again. Eventually, his breathing tube was removed because he could breathe on his own. Guckeen died on March 17, 2003.

¶19    Dr. Fagin explained that she had never seen skull fractures as bad as those suffered by Guckeen. She described Guckeen's brain as pulped, and opined that the swelling was putting pressure on the brainstem. According to Dr. Fagin, barring a miracle, Guckeen would not have survived no matter what surgery was done.

¶20    Dr. Fagin's opinion was that Guckeen died of traumatic brain injury, and neither morphine nor extubation contributed to his death.

¶21    Dr. Winslow's opinion was that Guckeen died of a blunt trauma to the head

resulting in a closed head injury, with no contribution from morphine or extubation.

¶22 Dr. Gary Dale, the State Medical Examiner, testified he could not give an opinion what caused Guckeen's death to a high degree of certainty. He did, however, state that it was his opinion that preexisting conditions did not contribute to Guckeen's death. His opinion was that, more likely than not, an increased dose of morphine caused Guckeen=s death. However, in his report he listed the cause of Guckeen's death as unknown.

¶23 Dr. Daniel Spitz (Dr. Spitz), a forensic pathologist, testified for the defense. After reviewing Guckeen's medical records, he gave the opinion that Guckeen died of respiratory failure caused by injuries to the brain and skull, morphine intoxication and extubation. In Dr. Spitz's opinion, Guckeen was never brain dead, and breathing on his own for over a day suggested his brain stem was relatively intact. Dr. Spitz stated he could not comment on whether Guckeen's treatment ended too early, as a proper brain-death protocol was not performed. He stated he was unable to determine what chance Guckeen had to survive his injuries. He did agree that the injuries were severe enough to possibly cause death regardless of treatment, and that the proximate cause of death was blunt head trauma, which initiated the sequence of events leading to Guckeen's death.

¶24 Dubois was charged by an amended information with Deliberate Homicide in violation of ' 45-5-102(1), MCA. He pled not guilty and trial by jury commenced on January 26, 2004.

¶25 Dubois objected to the District Court's instruction no. 12. This instruction provided that the element of purpose or knowledge necessary to convict Dubois of deliberate homicide could be established even if Dubois did not contemplate that his

6

blows with the baseball bat would kill Guckeen, if the result involved the same kind of injury that was contemplated.

¶26 Dubois' trial counsel did not offer an instruction on whether his actions were the proximate cause of Guckeen's death. Appellate counsel claims this omission was both plain error and ineffective assistance of counsel.

¶27 One Vicki Algeo (Algeo) testified for the defense at trial. The prosecutor, by use of a leading question on re-cross examination, elicited from this witness that she felt Dubois was a gangster. Dubois moved for a mistrial on this ground, which motion was denied.

¶28 During closing argument, Deputy County Attorney Mary Ann Ries (Ries) characterized one of Dubois' statements as a lie. Dubois also moved for a mistrial on this ground, which motion was denied.

¶29 The jury found Dubois guilty of deliberate homicide. The District Court sentenced Dubois to Montana State Prison for life without parole. This appeal followed.

STANDARDS OF REVIEW

¶30 This Court reviews jury instructions in a criminal case to determine if they fully and fairly instructed the jury on the law applicable to the case. The district court has broad discretion in instructing the jury, and this Court will only find reversible error if a jury instruction prejudicially affected the substantial rights of the defendant. *State v. Baker*, 2004 MT 393, & 14, 325 Mont. 229, & 14, 104 P.3d 491, & 14.

¶31 This Court's inherent power of common law plain error review is used sparingly, on a case-by-case basis. Plain error review is undertaken only in those cases that

7

implicate a criminal defendant's fundamental constitutional rights, where failing to review the claimed error at issue may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. *State v. Finley* (1996), 276 Mont. 126, 137-38, 915 P.2d 208, 215, *abrogated in part on other grounds by State v. Gallagher*, 2001 MT 39, & 21, 304 Mont. 215, & 21, 19 P.3d 817, & 21; *State v. Hill*, 2005 MT 216, ¶ 15, 328 Mont. 253, ¶ 15, 119 P.3d 1210, ¶ 15.

¶32     In considering ineffective assistance of counsel claims, we apply the two-pronged test set forth by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. This Court will only find ineffective assistance of counsel if the petitioner can show that (1) "counsel's performance was deficient or fell below an objective standard of reasonableness," and (2) "establish prejudice by demonstrating that there was a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Kougl*, 2004 MT 243, & 11, 323 Mont. 6, & 11, 97 P.3d 1095, & 11 (quoting *State v. Turnsplenty*, 2003 MT 159, & 14, 316 Mont. 275, & 14, 70 P.3d 1234, & 14).

¶33     In deciding a motion for mistrial, a district court must determine whether a defendant has been denied a fair and impartial trial. This Court reviews a district court's denial of a motion for mistrial for abuse of discretion. *State v. Aceto*, 2004 MT 247, & 16, 323 Mont. 24, & 16, 100 P.3d 629, & 16. A district court properly grants a motion for mistrial when a reasonable possibility exists that inadmissible evidence may have

contributed to the conviction. *State v. Long*, 2005 MT 130, & 24, 327 Mont. 238, & 24, 113 P.3d 290, & 24.

## DISCUSSION

## ISSUE ONE

¶34 **Did the District Court err in its jury instruction no. 12 concerning the requisite mental state for deliberate homicide?**

¶35 Dubois argues that giving jury instruction no. 12 was error because it did not fit the facts of his case and thus was an incorrect and inapplicable statement of the law. He claims that the giving of this instruction prohibited him from convincing the jury to acquit him on the deliberate homicide charge, even if the jury determined that Guckeen did not die because of the blows from the baseball bat, but instead died from the morphine administered to him in the hospital.

¶36 Instruction No. 12 provided:

> If purposely or knowingly causing death was not within the contemplation or purpose of the Defendant, either element can nevertheless be established if the result involves the same kind of harm or injury as contemplated but the precise harm or injury was different or occurred in a different way, unless the actual result is too remote or accidental to have a bearing on the Defendant=s liability or on the gravity of the offense.

¶37 Instruction No. 12 is taken from § 45-2-201(2)(b), MCA. We interpret this statute to mean that the mental state for deliberate homicide can be established if the result involves the same or similar kind of harm or injury as that which is contemplated by the defendant, even if the degree of injury actually caused was not contemplated by the defendant. *State v. Clausell*, 2001 MT 62, ¶ 41, 305 Mont. 1, ¶ 41, 22 P.3d 1111, ¶ 41.

9

¶38 Instruction No. 12, as given by the District Court, did not prevent the jury from deciding to acquit Dubois of deliberate homicide, and perhaps convict him of assault. If the jury had believed that Guckeen died from the effects of morphine, rather than the head injuries he received, it could also have determined that the actual result of Dubois' actions, death, was too remote or accidental to have a bearing on his liability or on the gravity of the offense. And, if the jury so determined, the elements of purpose or knowledge would not have been established, which would in turn result in an acquittal of the charge of deliberate homicide. Indeed, counsel for Dubois argued to the jury that he should perhaps be convicted of aggravated assault and not deliberate homicide, because Guckeen died from morphine, not the blows to the head.

¶39 Instruction No. 12 was a correct statement of the law, was applicable to the facts of this case, and did not prevent Dubois from raising a reasonable doubt that he was not guilty of deliberate homicide because Guckeen died from morphine intoxication.

ISSUE TWO

¶40 **Did the District Court err in failing to give a specific instruction on proximate cause?**

¶41 Dubois argues that, even though he did not offer a jury instruction on proximate cause, this Court should invoke the doctrine of plain error to review the failure of the District Court to give such an instruction, and order a new trial. Dubois argues that without an instruction on proximate cause the jury lacked the means to make a factual finding regarding his central theory of the case.

10

¶42 In order to undertake plain error review, we must determine that not reviewing the claimed error will result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process. *Finley*, 276 Mont. at 137, 915 P.2d at 215.

¶43 As we explained in our discussion of Issue One, jury instruction no. 12 correctly stated the law. While this instruction explained that the jury did not need to find that Dubois intended to kill Guckeen to find him guilty of deliberate homicide, it did require the jury to determine that Dubois caused Guckeen's death.

¶44 In addition to instruction no. 12, instruction no. 10 listed the elements of deliberate homicide, one of which was that Dubois caused the death of Guckeen.

¶45 We conclude that the jury instructions fully and fairly instructed the jury on deliberate homicide. Thus, the jury was properly instructed. *State v. Magruder* (1988), 234 Mont. 492, 497, 765 P.2d 716, 719. Under the facts of this case, the lack of a specific proximate cause instruction did not result in a manifest miscarriage of justice, did not leave unsettled the question of the fundamental fairness of the trial or proceedings, and did not compromise the integrity of the judicial process. We decline to exercise plain error review and determine that a proximate cause instruction was necessary in order for Dubois to have a fair trial.

### ISSUE THREE

¶46 **Was Dubois' counsel ineffective in not offering an instruction on proximate cause?**

¶47 Dubois argues that his trial counsel was deficient in failing to offer an instruction

11

on proximate cause because of the defense theory that morphine, not the attack by Dubois, was the proximate cause of Guckeen's death. He argues that failing to offer an instruction on proximate cause prevented the jury from having means to agree with this theory.

¶48 To assess a claim of ineffective assistance of counsel, both on direct appeal and in post-conviction proceedings, this Court applies the two-prong test from *Strickland*. *See Dawson v. State*, 2000 MT 219, ¶ 20, 301 Mont. 135, ¶ 20, 10 P.3d 49, ¶ 20; *State v. Hagen*, 2002 MT 190, ¶ 17, 311 Mont. 117, ¶ 17, 53 P.3d 885, ¶ 17. The *Strickland* test requires the defendant to show that his counsel's performance was deficient and that the deficient performance prejudiced the defense and deprived the defendant of a fair trial. *Dawson*, ¶ 20. It is not necessary to determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiency. If it is easier to dispose of an ineffectiveness claim on the ground of lack of prejudice, that course should be followed. *State v. DeMary*, 2003 MT 307, ¶ 27, 318 Mont. 200, ¶ 27, 79 P.3d 817, ¶ 27 (citing *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699).

¶49 In order to satisfy the prejudice prong of the *Strickland* test, a defendant must demonstrate that counsel's errors were so serious that he was deprived of a fair trial. As we have determined that a proximate cause instruction was not required in order for Dubois to have a fair trial, his counsel was not ineffective because he did not offer such an instruction.

¶50  **Did the District Court err in denying Dubois' motion for a mistrial because the prosecutor, in cross-examining a defense witness, described him as a gangster?**

¶51  During trial, Algeo, a friend and roommate of Guckeen, testified for the defense. During re-cross examination, the following exchange took place between Algeo and Deputy County Attorney Ries:

> Q: And when you and Tony were having this conversation, you were trying to figure out why it happened; is that fair to say?
> A: Yes.
> Q: You were trying to figure out why Rodney would beat your good friend, Dion; is that right?
> A: Yes.
> Q: And you told the detectives that Dion would never threaten, especiallyBDion would never threaten his type, referring to Rodney?
> A: Yes.
> Q: And you explained that Rodney is like a gangster, and Dion would never threaten him; is that right?
> A: Uh-huh.
> Q: Detective Phillips asked you if Dion was that aggressive, do you recall that?
> A: Uh-huh.
> Q: And you said Dion=s not that stupid.
> A: Yes.
> Q: And you explained to the detective that Dion's scared to death, you know, he's not a fighter.  He doesn't like fights.
> A: Right.
> Q: Is that accurate?  Is that how Dion was?
> A: Yes.

¶52  Dubois moved for a mistrial based upon the reference to him as a gangster.  The District Court denied this motion, but offered to give a curative instruction if Dubois requested one.

¶53  Dubois argues that the State's use of the term "gangster" in reference to him

contributed to his conviction. Dubois argues that the use of this word is inflammatory, prejudicial and violated multiple rules of evidence. He contends that the use of this term undermined his theory of justifiable use of force, because it could have swayed one or more jurors against this theory. Dubois also contends that this term may have caused one or more jurors to wish to punish Dubois in spite of the evidence.

¶54     Algeo used the term "gangster" in her statement to the police and the State could properly question her about it. Further, use of the term "gangster," given all the evidence at trial, would be unlikely to cause the jury to punish Dubois even if he was not proven guilty. There was substantial other evidence regarding Dubois' violent behavior and use of illegal drugs.

¶55     Considering the circumstances, we conclude the District Court did not abuse its discretion when it denied Dubois' motion for a mistrial because of the testimony in question.

ISSUE FIVE

¶56     **Did the District Court err in not granting Dubois a mistrial because, in closing, the prosecutor used the word "lie" in referring to a statement by Dubois?**

¶57     During her closing argument, prosecutor Reis argued to the jury concerning Dubois' statements as follows:

> And [Deputy] Van Dyken asked, he says, does it have to do with dope?
> And [Dubois] says, I can't say. Why can't he say? Because it's a lie.

¶58     Dubois moved for a mistrial because Ries said he lied. The District Court agreed that the statement was improper, but denied Dubois' motion. Dubois accepted the

14

District Court's offer of the following instruction, which the District Court read to the jury:

> The Court has determined that it was improper for the state to characterize a prior statement of Mr. Dubois as a lie. You are instructed that you are to disregard that portion of the state's argument.
>
> You are the sole judges of the credibility of all of the witnesses in this case. You're further admonished that the closing arguments of counsel are not evidence and are not to be considered by you as such.

¶59 This Court has strongly disapproved of characterizing testimony as a lie. *State v. Arlington* (1994), 265 Mont. 127, 157, 875 P.2d 307, 325. However, we have also explained that "We are not suggesting that it is reversible error every time counsel mentions the word 'lie' in closing argument." *State v. Stringer* (1995), 271 Mont. 367, 380, 897 P.2d 1063, 1071. We did conclude in *Arlington* that the prosecutor committed error in repeatedly suggesting that the defendant had lied, but a new trial was not necessary because of the overwhelming evidence of the defendant's guilt. *Arlington*, 265 Mont. at 158, 875 P.2d at 325.

¶60 While Ries' characterization of a statement by Dubois as a lie was improper, the District Court immediately gave a clear and cogent corrective instruction to the jury, and the evidence of Dubois' guilt was very substantial. The general rule is that where the trial judge strikes improper statements from the record with an accompanying cautionary instruction to the jury, any error committed by its introduction is presumed cured. *State v. Brush* (1987), 228 Mont. 247, 251, 741 P.2d 1333, 1335; *State v. Smith* (1986), 220 Mont. 364, 375, 715 P.2d 1301, 1308; *State v. Freeman* (1979), 183 Mont. 334, 345, 599 P.2d 368, 374. Further, as we discussed in *Freeman,* the jury cannot be presumed to

ignore its duty to respect the instructions of the court. *Freeman,* 183 Mont. at 345-46, 599 P.2d at 374-75.

¶61　Because the trial court is in the best position to observe the jurors and determine the effect of questionable statements made in closing argument, it is given a latitude of discretion in its rulings on motions for mistrial based on such statements. *See State v. Long,* 2005 MT 130, ¶ 27, 327 Mont. 238, ¶ 27, 113 P.3d 290, ¶ 27; *Brush,* 228 Mont. at 252-53, 741 P.2d at 1336. Any prejudicial effect the prosecutor's statement may have had was promptly cured by the District Court's cautionary instruction to the jury. We conclude, based on the record of this case, that the District Judge did not abuse her discretion in denying Dubois' motion for a mistrial.

## CONCLUSION

¶62　The judgment and sentence of the District Court of the Eighth Judicial District, Cascade County, is affirmed.

/S/ JOHN WARNER


We Concur:

/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ BRIAN MORRIS